**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LONG ISLAND AIRPORT LIMOUSINE SERVICE CORP., Respondent.**

**No. 4, Docket 71–2131.**

United States Court of Appeals, Second Circuit.

Argued Sept. 12, 1972.

Decided Oct. 4, 1972.

Joseph S. Rosenthal, New York City (Friedlander, Gaines, Ruttenberg & Goetz, Maurice H. Goetz, New York City, on the brief), for respondent.

John D. Burgoyne, Atty., N. L. R. B. (Peter G. Nash, Gen. Counsel; Marcel Mallet-Prevost, Asst. Gen. Counsel; Kenneth B. Hipp, Atty., Washington, D. C., on the brief), for petitioner.

Before FRIENDLY, Chief Judge, and LUMBARD and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

The National Labor Relations Board petitions to enforce its order, 191 N.L. R.B. No. 16, issued against Long Island Airport Limousine Service Corp. (the Company), upon findings that the Company violated section 8(a)(1) of the National Labor Relations Act by interrogation, threats, and giving the impression of surveillance, and sections 8(a)(3) and (1) of the Act by discharging the chief union organizer.[1] Although this is a close case—the trial examiner and two of the five Board members would have dismissed the complaint—there is substantial evidence on the record considered as a whole to support the Board's findings. Accordingly, we enforce its order.

*The Section 8(a)(3) Violation*

The Company operates a limousine service between two Long Island coun-

---

1. The Union in question is Local 1034 of the International Brotherhood of Team- sters, Chauffeurs, Warehousemen and Helpers of America.

ties and Kennedy and LaGuardia Airports. The Company's main office and garage is in Farmingdale, Long Island; it also has a small dispatcher's office at Kennedy Airport. In late October 1969, the Union began a campaign to organize the Company's approximately 40 drivers. Its organizer was Michael Tritsch, who had been a Company driver since the preceding March. There was testimony that on November 3, Tritsch obtained the signature of driver Leonard Johnson on a Union card, that the solicitation occurred in the Kennedy Airport office, which measures about eight by 12 feet, and that a Company supervisor was a few feet away at the time. Later the same day at LaGuardia Airport, Tritsch asked two other drivers to join the Union and gave one of them blank authorization cards. Shortly thereafter, Tritsch was approached by another driver, Mel Prisco, who said "that he had heard about the Union" that day from another driver and that Tritsch "was one of the instigators [of] union activity." He asked why Tritsch had not "approached" him about the Union. Tritsch told Prisco that he had not attempted to solicit a card from him "because he was a known company informer." Prisco told Tritsch that, in his opinion, the Company could not "afford" to have a Union.

The very next day Tritsch was fired.[2] When he reported to work in the afternoon, he had with him his manifest and cash receipts from the previous day. As was customary, Tritsch entered the clerical office to turn them in, but Company manager Salvatore A. Marino suddenly appeared, told Tritsch he would accept the manifest and receipts, and directed him out of the office and into the garage. There Marino looked at the manifest and told Tritsch that he was suspended. When Tritsch asked why, Marino told him it was for failing to put on his manifest the amount of mileage he had covered the previous day.

At the hearing before the trial examiner, Company witnesses testified that on November 4 they did not know of either the existence of an organizational campaign or Tritsch's connection with it and that Tritsch had been fired because he was an unsatisfactory employee. Marino testified that he had suggested at some earlier time to Walter Stuart, the Company president, that Tritsch be discharged, that Stuart had "left the matter to me," and that the reasons for the discharge were Tritsch's failure to record mileage and submission of incomplete gasoline receipts. Stuart testified that on November 4 he had ordered Marino to discharge Tritsch after an office employee had shown him Tritsch's incomplete gasoline receipts and that this decision had also been based on Tritsch's poor employment record, including past speeding violations, frequent lateness, and failure to turn in daily cash receipts promptly.

The trial examiner, apparently under the impression that there had to be direct evidence that the Company knew that a Union was attempting to organize employees, found the testimony insufficient to establish such knowledge. The Board, by a three to two vote, disagreed, finding that the Company had been aware of Union activity. The Board based this finding on the circumstantial evidence in the record, stating:

Particularly pertinent are the facts that Tritsch was the union spearhead; that he had actively engaged in card solicitation on the day before his discharge; of the timing of the discharge; of the abrupt nature of the discharge; of the contradictory testimony of Respondent's witnesses regarding the decision to effectuate the discharge; of the shifting and essentially pretextual reasons offered as cause for the discharge; and of the disparate treatment according (sic) to Tritsch for his alleged misdeeds. This evidence raises more than a sus-

2. This was the Company's position. Tritsch claimed that he had been sus-

pended on November 4 and discharged the following day.

picion of illegal motivation. Indeed, the only plausible inference that can be drawn from this record is that Respondent did learn of Tritsch's union activities and discharged him for these activities. Accordingly, we find that Respondent discriminatorily discharged Tritsch in violation of Section 8(a)(3) and (1) of the Act.

In this court the Company again argues that there was no evidence that it had knowledge of Union activity before discharging Tritsch and that it was improper for the Board to make the double inference that the Company knew of such activity and of Tritsch's involvement with it.

■ We reject the Company's argument—apparently accepted by the trial examiner—that its knowledge of Union activities cannot be proved circumstantially. It is true that in many—perhaps most—section 8(a)(3) cases, an employer's knowledge of an organizing campaign is either conceded or overwhelmingly proved by direct evidence, and the real issues are whether the employer also knew that a particular employee was so engaged and fired him for that reason. E.g., N.L.R.B. v. Pembeck Oil Corp., 404 F.2d 105 (2d Cir. 1968), vacated and remanded on other grounds, 395 U.S. 828, 89 S.Ct. 2125, 23 L.Ed.2d 737 (1969), order enforced, 433 F.2d 308 (2d Cir. 1970) (per curiam) (organizer fired "within hours" after company received union request for recognition); N.L.R.B. v. United Mineral & Chemical Corp., 391 F.2d 829 (2d Cir. 1968) (organizer fired one day after union meeting; testimony that supervisor stated this was reason for dismissal). But this is not always the case. E.g., N.L.R.B. v. Dorn's Transportation Co., 405 F.2d 706 (2d Cir. 1969). More important, there is no good reason why the two factual propositions—employer knowledge of general Union activity and employer anti-Union motivation in discharging a particular employee—need be proved by different types of evidence. As to each, direct evidence may not be obtainable and circumstantial evidence and "inferences of probability drawn from the totality of other facts," N.L.R.B. v. Park Edge Sheridan Meats, Inc., 341 F.2d 725, 728 (2d Cir. 1965), are perfectly proper. See, e. g., N.L.R.B. v. Dorn's Transportation Co., supra; N.L.R.B. v. Firedoor Corp., 291 F.2d 328 (2d Cir.), cert. denied, 368 U.S. 921, 82 S.Ct. 242, 7 L.Ed.2d 136 (1961).

■ In this case the circumstantial evidence in the record furnished substantial support for the Board's findings. Tritsch was the union "spearhead" for organizing the Company's drivers, the timing of his discharge was "stunningly obvious," N.L.R.B. v. Rubin, 424 F.2d 748, 750 (2d Cir. 1970), a Company supervisor was only a few feet away when Tritsch allegedly obtained Johnson's signature on a union card,[3] and Tritsch was approached later that day by a reputed Company informer, who already knew that Tritsch was soliciting union support. In addition, the abruptness of Tritsch's discharge, the conflicting accounts of the reasons for his dismissal, and evidence of failure to impose severe discipline on other employees who failed to record mileage all lend support to the Board's findings that the Company "did learn of Tritsch's union activities and discharged him for these activities." It is true that there was testimony in the record that Tritsch had violated various Company rules and regulations in the past. The Company also introduced evidence of a particularly serious incident, occurring two months before, that involved missing daily cash collections, and the Company claimed that Tritsch had been warned that he would be discharged if the situation occurred again; Tritsch denied

---

3. Tritsch testified to this event although the supervisor denied that he had seen or heard such solicitation or knew of it and stated that Tritsch and Johnson had never even been in the office at the same time.

this. The trial examiner did not resolve this controversy, and the Board took note of the prior incidents but concluded that they were not the reason for the discharge. While we would not go so far as to say, as the Board did, that discriminatory intent in firing Tritsch was the "only plausible inference that can be drawn from this record," it was certainly a permissible one, even though the trial examiner chose not to make it.[4] In short, there was substantial evidence to support the Board's finding of a section 8(a)(3) violation.

*The Section 8(a)(1) Violations*

After Tritsch was discharged, the Union's campaign continued. On November 10, 1969, two Union officials appeared at President Stuart's office, stated that they had authorization cards from a majority of the drivers and asked for union recognition. The Company declined, and a representation election was held on January 8, 1970. The Union won the election, was thereafter certified as bargaining representative, and, by the conclusion of the hearing before the trial examiner, was bargaining with the Company. However, in the period prior to and just after the election various incidents occurred that, along with the discharge of Tritsch, are the basis for the Board's findings that the Company violated section 8(a)(1) of the Act by interrogation, threats, and giving the impression of surveillance.

As to the first of these alleged violations, the Board found that in the period after the discharge of Tritsch but before the election, President Stuart several times questioned drivers Kenneth Reid and Yacov Yardeny "as to what they thought about the Union, whether they were for or against the Union, and whether they participated in obtaining signatures to union cards." The trial examiner recommended that the charge be dismissed, partly because of his concern that, in view of the then current bargaining situation, a section 8(a)(1) order would "only serve to disrupt relations between the parties. . . ." We must confess that the same thought has occurred to us, but we recognize that the Board has the power to conclude, as it did, that if a violation occurred a remedial order is appropriate.[5] See Luxuray of New York, Div. of Beaunit Corp. v. N.L.R.B., 447 F.2d 112, 114 (2d Cir. 1971). The only question, then, is whether a violation did occur, and we conclude that the Board's finding that it did must be sustained. While cases of unlawful interrogation are frequently close—and this one is no exception—the evidence in the record was sufficient. It was the Company president doing the questioning, specific information was sought as to the employees' role in and attitude toward the Union's campaign, and the discriminatory discharge of Tritsch had occurred only a short time before. It is

---

4. The Board's disagreement with the trial examiner does not in this case significantly detract from the substantiality of the support in the record for the Board's findings. We have recognized that "[w]hile only the trial examiner can fully evaluate credibility, the Board is fully as capable of weighing the other inferences. . . ." NLRB v. Park Edge Sheridan Meats, Inc., 341 F.2d 725, 728 (2d Cir. 1965). See Universal Camera Corp. v. NLRB, 340 U.S. 474, 492–497, 71 S.Ct. 456, 95 L.Ed. 456 (1951) ; FCC v. Allentown Broadcasting Corp., 349 U.S. 358, 364, 75 S.Ct. 855, 99 L.Ed. 1147 (1955). Moreover, the weight to be given the trial examiner's report is,

in any event, somewhat diluted by his apparent erroneous conception that the Company's knowledge of the union drive could only be established by direct evidence.

5. The Board noted that:
[T]he Union, equally engaged in the bargaining relationship, found it appropriate to file the instant charges. It would thus appear that the Union had no fear of disturbing the negotiations. In view of Respondent's conduct as established by the entire record, we believe that any fear of disturbing the bargaining relationship would be misplaced.

true that not all of the indicia of coercive interrogation, see Bourne v. N.L.R.B., 332 F.2d 47 (2d Cir. 1964) (per curiam), were present, but we have held that that is not dispositive. See N.L.R.B. v. Gladding Keystone Corp., 435 F.2d 129, 132–33 (2d Cir. 1970).

 The remaining incidents that form the basis for the Board's order are even less overwhelming. In the course of his conversations with Reid and Yardeny, Stuart said that if the Union were elected, he would "be forced to treat everybody equally," and he would have "to be a lot more rigid in [his] rules and regulations." The Board took these remarks to be much more offensive than we do, and if they stood alone, we might not be disposed to enforce the 8(a)(1) order on that ground. Cf. N.L.R.B. v. General Stencils, Inc., 438 F.2d 894, 900–901 (2d Cir. 1971). But the Board specifically took into account that Tritsch had been discharged shortly before for an "alleged failure to obey an often broken regulation," and on that basis we agree that there was sufficient support for the finding of illegal threatened reprisal. Finally, shortly after the Board election, Stuart stated to Yardeny in effect that he knew which drivers had voted for and which against the Union. The Board found that this was an attempt by Stuart to create the impression that he had been keeping the Union's activities under surveillance. and, as such, was unlawful. There was sufficient evidence in the record to support this finding.[6]

Enforcement granted.

6. The Company argues primarily that it never had a fair chance to meet this charge because the complaint specified that Stuart's conduct was unlawful interrogation, a claim the trial examiner dismissed because Yardeny had not been asked to declare himself as a friend or foe of the Union. However, the issue was raised before the Board by General Counsel and the Company suggests no further evidence it could have presented had it known of the new theory at the time of the hearing.