NATIONAL LABOR RELATIONS
BOARD,
Petitioner–Cross–Respondent,

v.

S.E. NICHOLS, INC.,
Respondent–Cross–Petitioner.

Nos. 137, 275, Dockets 88–4057, 88–4087.

United States Court of Appeals,
Second Circuit.

Argued Oct. 4, 1988.

Decided Nov. 29, 1988.

Leonard W. Wagman, New York City (Golenbock and Barell, Robert S. Goodman, Charles S. Joseph, of counsel), for respondent-cross-petitioner.

William A. Baudler, N.L.R.B., Washington, D.C. (Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Susan L. Williams, Supervisory Atty., N.L.R.B., Washington, DC, of counsel), for petitioner-cross-respondent.

Before FEINBERG, Chief Judge, NEWMAN and GARTH,* Circuit Judges.

FEINBERG, Chief Judge:

The National Labor Relations Board applies for enforcement of its order against S.E. Nichols, Inc., and Nichols cross-petitions to vacate the Board's order. The Board found that Nichols had violated section 8(a)(1), (3) and (4) of the National Labor Relations Act by, among other things, discharging four union activists and otherwise coercing employees, harassing employees on account of their participation in Board proceedings and discriminating against them in their terms of employment. To remedy these violations, the Board fashioned an expansion of its traditional remedies, including a broad set of affirmative requirements. Nichols objects to almost all of the Board's findings of violations, the breadth and severity of its proposed remedy and the consolidation of two complaints by the Administrative Law Judge (ALJ). With one modification, we enforce the Board's order.

## I. Background

The petitions before us are occasioned by a bitter labor dispute in upstate New York. The following summary of the facts is based upon the Board's findings. Nichols, which we sometimes refer to hereafter as "the company," operates in many states a chain of 43 self-service discount retail department stores. The company has a long history[1] of using unlawful means to resist unionization at its stores, and this controversy arises out of efforts between August 1979 and June 1980 to unionize its store in Herkimer, New York. At the time, the store had approximately 70 employees.

In August 1979, Dorothy Reinhardt and Doug Vincent, two Herkimer employees, began discussing the need for a union at the Herkimer store. On August 31, Reinhardt and Vincent contacted two representatives of the Retail Store Employee's Union Local 345, United Food and Commercial Worker's International Union, AFL–CIO, hereafter referred to as "the union,"[2] and received blank union authorization cards to give to their fellow employees.

Earlier that day, Denise Styles and Kristin Burkle, two security employees, began to organize a walkout in protest over a changed work schedule, which increased the number of hours and days to be worked each week. They were dissuaded from this course of action by Reinhardt, and they agreed to join the incipient union organization. By September 2, Reinhardt, Vincent and Styles had obtained about 27 signed union authorization cards. On September 7, the union petitioned for a representation election.

Henry Korcz, the company's supervisor of the district in which the Herkimer store is located, knew of the growing union sentiment at Herkimer by September 2, at the very latest, and immediately visited the store. Concurrent with his arrival, management began vigilant observation of the areas in which Reinhardt and Vincent worked. On September 3, Korcz summarily fired both Reinhardt and Vincent with previously prepared pay checks. The store manager, Robert Hathorn, then dismissed Burkle and Styles in the same manner the following day. On September 4, Korcz received a mailgram from the union claiming that it represented a majority of the company's employees. In response to the unionization efforts, Korcz held a series of meetings with employees in which management

* Honorable Leonard I. Garth, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

1. See, e.g., S.E. Nichols Marcy Corp., 229 NLRB 75 (1977), enforced by consent judgment, No. 77–4154 (2d Cir.1977) (actions during aggressive anti-union campaign in Marcy, New York store violated Act); S.E. Nichols Shillington Corp., 195 NLRB 189 (1972), enforced, 475 F.2d 1395 (3d Cir.), cert. denied, 414 U.S. 860, 94 S.Ct. 73, 38 L.Ed.2d 110 (1973) (discharge of union activist in Shillington, Pennsylvania store violated Act); S.E. Nichols of Ohio, Inc., 195 NLRB 939 (1972), enforced, 472 F.2d 1228 (6th Cir.1972) (discharge of emerging union leaders in New Philadelphia, Ohio store violated Act).

2. Local 345 was merged with Local 1 in November 1979, and Local 1 was the petitioning labor organization before the Board.

aggressively lobbied against unionizing the store. In one of these meetings, as the ALJ noted,

> Korcz was asked if the four discriminatees would be reinstated, to which he answered: "[Y]es, but once they're reinstated, they don't last too long"; in other words, pretexts would be found for their later discharge.

On September 7, the union filed unfair labor practice charges, claiming that the discharges of the union activists, Korcz's tactics at the meetings with employees and a company rule restricting the acceptance of literature on company property all violated the Act. A complaint issued in October 1979, and was tried as case No. 3–CA–9304 before the ALJ in March 1980. The ALJ heard evidence from 15 witnesses over a three-day period.

Employees Fred Pumilio, June Klimacek, and Margaret Goldsmith testified against the company at the hearing before the ALJ. Shortly thereafter, the three employees were subjected to increased scrutiny and harassment by the store's management. Pumilio and Klimacek were given written warnings about their behavior, and Goldsmith was not granted a promised raise. Manfred Brecker, the president of the company, told her to "ask the Union to give [her] a raise."

In the months following the March unfair labor practice hearing, the top officers of the company, including president Brecker and district supervisor Korcz, continued their aggressive campaign against the unionization of the Herkimer store. Brecker, whose office was in New York City, paid three unusual visits to the Herkimer store in April and June, and held meetings with both small and large groups of employees to discourage them from supporting the union. In these meetings, Brecker, among other things, embarrassed Pumilio, Klimacek and Goldsmith by ridiculing their complaints about management and said that "hell would have to freeze over before [Reinhardt, Vincent, Burkle and Styles] would get hired again." Brecker also said that when those dismissed because of union activities "do come back they don't last

long because people don't get along with them and I consider them troublemakers and they leave."

This post-hearing harassment and coercion gave rise to another unfair labor practice charge. A second complaint, 3–CA–9714, issued in May 1980, and was amended in June and September. This complaint, as amended, alleged that on various occasions between March and June 1980, the company violated the Act at its Herkimer store.

In June 1980, an election was held pursuant to the union representation petition that had been filed in September 1979. The union lost the election, and no objection was filed.

On July 3, 1980, the ALJ granted the motion of the Board's General Counsel to reopen the record and to consolidate case 3–CA–9714 with the first complaint, case 3–CA–9304, arising out of the same union campaign. The ALJ scheduled a new hearing in September 1980. Meanwhile, the Board's Regional Director had filed a petition in the United States District Court for the Northern District of New York, pursuant to section 10(j) of the Labor Management Relations Act, 29 U.S.C. § 160(j), for a temporary injunction against the company's unfair labor practices pending hearing and decision in the case before the Board. On July 8, 1980, Judge Neal McCurn denied the application. The denial was affirmed by order of this court in February 1981, in which, however, we expressed doubt over whether the district court "applied too strict a standard" and made clear that the affirmance was not "in any way intended to prejudge the pending Labor Board proceeding or any future court action brought in respect thereto."

The consolidated cases were heard by ALJ Klein in September 1980. At the hearing, the parties stipulated that the record of the section 10(j) proceeding be used in lieu of testimony on the charges covered by the second complaint. The ALJ issued a lengthy opinion in December 1980, finding Nichols in violation of § 8(a)(1), (3) and (4) of the Act and ordering expansive remedies against the Company.

In June 1987, a three-member panel of the Board affirmed the ALJ's rulings, findings and conclusions with certain modifications and limited the recommended remedies in certain respects.[3] One member dissented in part and would have further limited the ALJ's decision. The Board agreed with the ALJ that the company violated § 8(a)(1) and (3) of the act by dismissing Reinhardt, Vincent, Styles and Burkle and by refusing to offer them reinstatement. The Board accepted most of the ALJ's findings that the company had committed numerous violations of § 8(a)(1) in its aggressive resistance to the Union. The Board also accepted the ALJ's findings that the company violated § 8(a)(1), (3) and (4) of the act by giving written warnings to Pumilio and Klimacek, by withholding a raise to Goldsmith, and by subjecting the three employees to ridicule, increased supervision and unfavorable working conditions.

The Board curtailed slightly the breadth of the measures fashioned by the ALJ to remedy the company's unfair labor practices. The Board's affirmative remedies required the company, among other things, to give a union, under specified conditions, access to company bulletin boards, notice of, and access to, management speeches regarding unionization, and access to the employees in order to give a 30–minute pre-election speech; to undertake a posting and mailing of a "Notice to Employees;" and to have president Brecker read the notice to all employees in the district and certain supervisors.

This petition for enforcement and cross-petition to vacate followed the Board's decision and order.

## II. Discussion

The company argues on appeal that the Board's findings of unfair labor practices are not supported by substantial evidence, that the Board abused its discretion in fashioning harsh and overbroad remedies, and that the ALJ's consolidation of the two complaints against the company was highly prejudicial to the company and requires a new trial of each complaint. The Board maintains that the findings and the remedy were within its broad discretion to identify and remedy violations of the Act, and the consolidation was not prejudicial.

### A. The Board's Unfair Labor Practice Findings

The Board and Nichols give radically different explanations for the company's actions between August 1979 and June 1980. According to the company, dismissals were not based on union activities but on employee inadequacy. Speeches by company officials were designed not to coerce workers but simply to express the company's point of view. Yet, in cases where difficult issues regarding employer motivation are of primary concern, the Act vests primary responsibility in the Board to resolve these critical issues of fact. NLRB v. American Geri–Care, Inc., 697 F.2d 56, 59–60 (2d Cir.1982), cert. denied, 461 U.S. 906, 103 S.Ct. 1876, 76 L.Ed.2d 807 (1983). Moreover, it is by now hornbook law that the Board's findings of fact can be overturned on review only if those findings are not supported by substantial evidence on the record considered as a whole.

In addition, credibility findings made by the ALJ and accepted by the Board will not be set aside unless they are "hopelessly incredible" or they "flatly contradict" either the "law of nature" or "undisputed documentary testimony." Id. at 60. It is true that the testimony regarding the unfair labor practices charged in the second complaint was not actually heard by the ALJ because the parties stipulated that the record from the section 10(j) proceeding in the district court be accepted in lieu of testimony. The company argues, in effect, that this lack of live testimony at the September 1980 hearing on the consolidated cases calls into question the ALJ's credibility determinations with respect to the second complaint. For this reason, the company urges us to rely more heavily on the

---

**3.** Hereafter, we will refer to the findings as the Board's, unless there is a reason to distinguish between the Board and the ALJ.

district court's finding in the section 10(j) proceeding that there was not reasonable cause to believe that the unfair labor practices charged in the second complaint had occurred. We do not find this reasoning persuasive. The Board found that all of the ALJ's credibility determinations regarding the second complaint were based on factors other than demeanor, and it then accepted those determinations. Under the circumstances, we are required to give great deference to the Board's determinations of credibility. Moreover, the law is clear that findings made on a motion for a temporary injunction under section 10(j) are not determinative of the merits in a subsequent unfair labor practice proceeding, and that review of the latter is limited by the substantial evidence rule. *NLRB v. Acker Indus., Inc.*, 460 F.2d 649, 652 (10th Cir. 1972); cf. *NLRB v. Knitgoods Workers Union Local 155*, 403 F.2d 388, 391 (2d Cir.1968). In addition, as indicated above, our affirmance of the district judge's denial of a 10(j) injunction made clear that resolution of that application would not affect the then pending Board proceeding. Keeping in mind the above considerations, we turn to the issues before us.

### 1. *The Discharges*

The company strenuously maintains that it discharged Reinhardt, Vincent, Styles and Burkle in September 1979 because they were performing their jobs unsatisfactorily. The Board found that the company's motives were less benign and that the discharges were in retaliation for union organizing activities and, thus, violated § 8(a)(3) and (1) of the Act. These sections provide in pertinent part that it is an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment" and "to interfere with, restrain, or coerce employees in the exercise of [their right to join or form labor unions]." 29 U.S.C. § 158(a)(3) and (1).

Firing an employee for engaging in union activities violates both § 8(a)(1) and (3) of the Act. *NLRB v. J. Coty Messenger Serv., Inc.*, 763 F.2d 92, 98 (2d Cir.1985). The key issue in discriminatory discharge cases is the employer's motivation. *Ab-* *bey's Transp. Services, Inc. v. NLRB*, 837 F.2d 575, 579 (2d Cir.1988). The Supreme Court has approved a two-part test for determining unlawful motivation. Id. (citing *NLRB v. Transp. Management Corp.*, 462 U.S. 393, 402–03, 103 S.Ct. 2469, 2474–75, 76 L.Ed.2d 667 (1983)). Initially, the General Counsel must establish a prima facie case that protected conduct was a motivating factor in the employer's decision to fire. The burden then shifts to the employer to show, as an affirmative defense, that the discharge would have occurred "in any event and for valid reasons." *Transp. Management*, 462 U.S. at 400, 103 S.Ct. at 2473. If the employer's asserted reasons for the discharge are shown to be a pretext to mask discrimination, the burden has not been met. *Abbey's Transp.*, 837 F.2d at 579.

■ The Board found a prima facie case of discriminatory discharge based both on the company's long history of antiunion animus and the company's knowledge of the employees' union activities. In addition to these basic findings, the Board made numerous other findings indicating unlawful motive. Nichols dismissed all four employees three or four days after they initiated and participated in the union organizing campaign at the store, and it never gave them preliminary warnings or discipline short of discharge for improper performance of their tasks. The employees were discharged with previously prepared paychecks, and they were given no chance to defend themselves. The abruptness of a discharge and its timing are persuasive evidence that a company has moved swiftly to eradicate the prime movers of a union drive, see *Abbey's Transp.*, 837 F.2d at 580 (citing *NLRB v. Montgomery Ward & Co.*, 242 F.2d 497, 502 (2d Cir.), cert. denied, 355 U.S. 829, 78 S.Ct. 40, 2 L.Ed.2d 41 (1957)). All of these facts provide a convincing case of discriminatory discharge.

The company's claim that it dismissed the workers for cause was rejected by the Board. Reinhardt had been commended on her work by district supervisor Korcz less than three weeks before her dismissal. Her immediate supervisor testified that she

was a "very good employee." Vincent had never been reprimanded and was regarded highly enough to have been granted a requested transfer. Moreover, the absence of discipline or warnings prior to discharge suggests that the alleged dissatisfaction with performance was an afterthought. The testimony by management was often contradictory, and the company failed to bring forth any convincing evidence that the employees deserved to be discharged. There is no doubt that the company's proffered reasons for the dismissals could validly be interpreted as pretextual. Clearly, there was substantial evidence in the record to conclude that the employees were fired on account of their union activities in violation of § 8(a)(1) and (3) of the Act.

### 2. Anti–Union Campaign

■ Based in large part on credibility determinations and inferences from the coercive atmosphere existing at the store, the Board found that the Company had committed, among others, the following violations of the Act: threatening further discriminatory discharges after the September 1979 dismissals in order to discourage union participation; soliciting employees to withdraw their union authorization cards; threatening that the company could discover who had signed union authorization cards; and threatening to discharge the four previously dismissed employees if they were reinstated. The company disputes these findings maintaining that its employee meetings following the discharges of four prominent union activists in September 1979 were designed to communicate legally and fairly the ramifications of labor representation, and that its policies did not discriminate between labor unions and other organizations. However, the ALJ heard the issues and resolved the conflicts of credibility. *United Aircraft Corp. v. NLRB*, 440 F.2d 85, 91 (2d Cir. 1971). We do not find the credibility findings by the ALJ and approved by the Board either incredible or flatly contradicted by undisputed documentary testimony. *American Geri–Care*, 697 F.2d at 60. Based on these reasonable credibility determinations and allowable inferences from the activities at the store, we find substantial evidence to support the Board's findings.

The company also objects to numerous other findings that it committed violations during the campaign. However, once again the company simply disagrees with the Board's findings and asks us to accept its characterization of the evidence as though our function were to determine facts rather than to decide whether the Board's findings are supported by substantial evidence on the record considered as a whole.

■ Thus, the company disputes a determination that it violated § 8(a)(1) by soliciting employee complaints and promising to rectify them. Nichols argues that it was not soliciting complaints and promising remedies in order to dissuade employees from joining unions but was simply acting in accordance with its "open door" policy. However, the Board found that before the union campaign, no meetings had ever been held in which employees were encouraged to state their complaints. We believe that the Board had substantial evidence to find that no prior open door policy existed and that such a belated change in policy towards grievances and corrective action constituted a violation of the Act. *NLRB v. Chester Valley, Inc.*, 652 F.2d 263, 270 (2d Cir.1981).

■ Similarly, the company objects to the finding that it enforced a no-solicitation rule in discriminatory fashion in violation of § 8(a)(1) of the Act. The company handbook dictates that no employee should distribute literature during working time on company property, and the company denies enforcing this provision in a discriminatory way. Yet, there was no evidence that any employee had ever been reprimanded for, or told to cease, soliciting or distributing for nonunion purposes even though there was voluminous testimony that employees constantly solicited for other kinds of organizations. Clearly, the Board's finding of an unfair labor practice in this respect was supported by substantial evidence. *NLRB v. J.P. Stevens & Co.*, 464 F.2d 1326, 1336

(2d Cir.1972), *cert. denied*, 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587 (1973).

■ Nichols also disputes the determination that during the campaign it offered wage increases to discourage employee support for a union. The company claims that it was simply carrying out an established policy regarding employee raises. The Board found that this policy, if it existed, was not uniformly applied and was not the motivation behind the statement. There was substantial evidence to support the finding that the offer of benefits was intended to discourage employee support for a union and therefore violated the Act. *J. Coty Messenger Serv.*, 763 F.2d at 96.

■ Finally, the company objects to a finding that it violated the Act by telling employees that they could receive the advice of the company's attorney in connection with interviews by Board investigators. Nichols claims that it was simply advising its workers of their right to counsel. The ALJ discounted this explanation because the advice seems to imply the need for protection and would have the effect of dissuading employees from cooperating with the Board's investigation since the "most fearless employee would find it difficult to provide the Board with information against his employer when he was accompanied and being 'advised' by the employer's counsel." The Board agreed, and so do we. In the context of a virulent anti-union campaign, the Board had substantial evidence to find a violation of the Act. Although the company does not rely upon it in this context, we note a decision of the Fifth Circuit, which held that a letter informing employees of their right to counsel did not violate the Act. *Florida Steel Corp. v. NLRB*, 587 F.2d 735, 751 (5th Cir.1979). In that case, however, an employer sent a letter to employees after an election had taken place, simply informing the employees that counsel was available. *Id.* In this case, Korcz, in the midst of an anti-union campaign in which four union activists had been fired, told the employees that "if they needed any protection he would get his lawyer to sit in on the meeting." The statement was made face-to-face to employees, the "advice" was given during a union campaign, and the employer offered only his own counsel.

Although we have not specifically discussed each and every violation found by the Board, the company is simply offering us in each instance an explanation for its actions that was rejected by the Board. After thorough examination of all of the claims, we uphold all of the Board's findings of violations committed during the company's campaign against unionization.

### 3. Harassment of Workers after Testimony in Board Proceedings

The Board found that Nichols violated § 8(a)(1), (3) and (4) by giving Klimacek and Pumilio written warnings, withholding Goldsmith's wage increase and subjecting the three employees to ridicule, increased supervision and unfavorable working conditions. The company maintains that its actions with respect to these employees were legitimate, and that it neither retaliated, nor discriminated, against them on account of their willing participation in a Board proceeding.

■ The Board found that the company began discriminating against the three employees just after their testimony in the March proceeding by enforcing previously unenforced rules, subjecting them to increased supervision and humiliating them in front of their fellow workers. Based on the employee's testimony, the Board found that supervisors gave a written warning to Klimacek without any investigation into alleged complaints about her behavior; gave a warning to Pumilio for actions which were accepted from others; and denied Goldsmith a pay raise and told her to "ask the Union to give her a raise."

We see no persuasive reason to disregard the testimony of the three employees found credible by the ALJ and the Board. The Board also properly considered the timing of management's decision to issue the disputed warnings. An inference of anti-union animus is proper when the timing of the employer's actions is "stunningly obvious." *American Geri–Care*,

697 F.2d at 60 (citing *NLRB v. Long Island Airport Limousine Serv. Corp.*, 468 F.2d 292, 295 (2d Cir.1972)). The Board also justifiably found that the sudden use of previously ignored rules supports a finding that the real reason for disciplining union adherents is their protected activity. *J.P. Stevens & Co. v. NLRB*, 380 F.2d 292, 296 (2d Cir.1967), cert. denied, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1968). The evidence adequately supports the findings that the Company violated § 8(a)(1), (3) and (4) in its treatment of these three employees.

After a thorough examination of all of the Board's findings of unfair labor practices, we uphold the findings in their entirety.

## B. *The Board's Remedial Power*

Section 10(c) of the Act directs the Board, if it concludes that a party before it has engaged in an unfair labor practice, to order the party "to cease and desist from such unfair labor practice, and to take such affirmative action ... as will effectuate the policies" of the Act. 29 U.S.C. § 160(c). The Supreme Court has consistently stressed that the Board's remedial power "is a broad discretionary one, subject to limited judicial review." *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964). The Board's order should "not be disturbed 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.'" *Id.* (quoting *Virginia Electric & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943)).

The Board's order in this case contains the usual cease and desist, reinstatement and back pay provisions about which there can be no valid question in light of our holding as to the substantiality of the evidence. The company's remaining objections are to various affirmative steps required of the company in order to eliminate the coercive atmosphere created by its improper activities. *See United Steelworkers of Am. v. NLRB*, 646 F.2d 616, 635 (D.C. Cir.1981) (citing *Textile Workers Union v.*

*Darlington Mfg. Co.*, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965)).

Those remedial steps can be loosely grouped into access remedies and notice remedies. As to the former, the Board ordered the company (1) to give a union, upon request, reasonable access to company bulletin boards for a one-year period in the stores in Korcz's district; (2) to grant a union equal time if a store in the district convened its employees for a speech on union representation and rebuttal time if requested; and (3) to allow a participating union to make one 30-minute pre-election speech if there is a Board election involving the union in the district. As to the notice remedies, the Board ordered the company to post a notice in all stores in the district, to mail the notice to all employees in the district, and to have president Brecker read the notice to all employees in the district and to certain supervisors. Before considering the company's specific objections to each group of remedies, we turn to its principal objection, which applies to both.

The ALJ recommended that the various remedial sanctions be applied to all 43 of the company's stores in many states. The Board cut back the effect of the recommended order by limiting it to the eight stores in the district supervised by Korcz—five in upstate New York and three in Ohio. The company argues to us that the order so limited is still too broad, and that, if enforced at all, it should apply only to the Herkimer store where the unfair labor practices occurred.

In certain cases, the Board has discretion to expand its remedial powers beyond the actual locations at which unfair labor practices were committed in order to offset effects caused by extensive unlawful conduct. *NLRB v. Jack La Lanne Management Corp.*, 539 F.2d 292, 295 (2d Cir.1976) (unfair labor practices at one location remedied at 10); *United Aircraft Corp. v. NLRB*, 440 F.2d at 100; *J.P. Stevens*, 380 F.2d at 304. In the past, this court has considered a number of factors relevant in determining whether the Board, in its discretion, could expand its customary remedial order: whether the employer has re-

peatedly shown anti-union animus on a broad scale, *Jack La Lanne,* 539 F.2d at 295; *United Aircraft,* 440 F.2d at 100; whether the locations subject to the order are closely related geographically, *Jack La Lanne,* 539 F.2d at 295; *United Aircraft,* 440 F.2d at 100; *J.P. Stevens,* 380 F.2d at 304; whether employees are transferred from one location to another or are readily in communication with one another, *Jack La Lanne,* 539 F.2d at 295; and whether a company's labor policies are determined at a central location rather than at each individual workplace. *J.P. Stevens,* 380 F.2d at 304.

In this case, Nichols has a long history of illegal anti-union activity. We take judicial notice, as did the Board, of the many cases finding the company or its affiliates in violation of the Act for efforts to interfere with the statutory right of its employees to establish a union. See supra note 1. In the case now before us, the Board found that the company's long history of violations justified imposition of extraordinary access and notice remedies. Earlier, in *S.E. Nichols of Ohio, Inc.,* 258 NLRB 1, 1 n. 3 (1981), enforced, 704 F.2d 921 (6th Cir.), cert. denied, 464 U.S. 914, 104 S.Ct. 275, 78 L.Ed.2d 256 (1983), the Board had noted the company's clear "disregard for the rights of its employees and its contempt for" the Act, the Board and the Sixth Circuit. At that time, the Board also stated that the company's history of committing unfair labor practices "clearly demonstrates" that over a 15–year period the company had "uniformly committed unlawful acts in response to attempts to organize [its] stores." This history almost certainly indicates a general knowledge by the company's employees that it is willing and likely to engage in coercive activity in response to union campaigns in its stores. See *J.P. Stevens,* 380 F.2d at 304.

The eight district stores affected by the order are all in New York and Ohio, and three stores—those in Herkimer, Marcy and New Hartford—are within 13 miles of one another. The record also reveals that employees have moved between the stores. Edward Lintz, an anti-union employee at Herkimer, had previously worked at the Nichols store in Marcy. Robert Hathorn, the Herkimer store manager, had been an assistant manager at a Nichols store in New Philadelphia, Ohio, and Korcz had previously been manager of the Marcy store. Korcz also testified that labor policy is not determined at each individual store but by president Brecker in New York City.

One other factor is very important in considering the Board's discretion to apply its remedies throughout the district. The people responsible for managing the stores at the district-wide level were the individuals most culpable for the findings of violations at Herkimer. District supervisor Korcz, who visited each store in the district at least once a month, participated directly, personally and repeatedly in the unfair labor practices at the Herkimer store. The Board found that Korcz told the employees that the company would engage in the same conduct against the union at Herkimer as it did at its store in Marcy, even though Korcz knew the conduct was unlawful. See *S.E. Nichols Marcy Corp.,* 229 NLRB 75, enforced by consent judgment, No. 77–4154 (2d Cir.1977). President Brecker repeatedly and unrelentingly attacked the Board's neutrality and openly disparaged those employees who had testified on behalf of the Board. He also used coercive tactics such as stating, in effect, that reinstated union adherents do not last very long in the company's employ. The record also shows that Brecker had previously participated in unfair labor practices at two stores located in Korcz's district.

■ In short, we believe that there is substantial evidence in the record as a whole of a conscious corporate-wide policy to coerce company employees in the exercise of their right to join or form labor unions, at least in the area subject to the jurisdiction of district supervisor Korcz. On this record, therefore, the Board had discretion to select remedies coextensive with that company policy, which was a violation of the Act, and to impose district-wide access and notice requirements in the eight stores in Korcz's district in order to remedy the chilling effect of the company-produced coercive atmosphere.

Turning now to other aspects of the remedial relief, the company objects to all of the access remedies on the same grounds: there are no findings that the company restricted union access, and the Board unlawfully invaded the company's property rights by forcing them to open their doors to unwanted individuals. We find neither of these arguments persuasive.

■ There is no doubt that an extensive campaign of unfair labor practices can produce effects on employees that cannot be offset simply by reinstating discharged employees or by other conventional remedies. *See United Steelworkers*, 646 F.2d at 634–35. To offset the effects of such unfair labor practices, courts and the Board have recognized that at times more extensive remedies are needed. In order to accomplish that result, it has been found necessary in some cases to grant a union access to company bulletin boards or to the plant itself. *Id. See also NLRB v. J.P. Stevens & Co.*, 563 F.2d 8, 24–25 (2d Cir.1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1240, 55 L.Ed.2d 765 (1978) (access remedies needed to "dissipate the fear in the atmosphere within the Company's plants generated by its anti-union campaign.") We believe that the Board had discretion to impose these more extensive remedies in order to assure employees that the company will not interfere with their statutory right to join a union. *United Steelworkers*, 646 F.2d at 635. The access remedies certainly do not constitute "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the act." *Fibreboard Products*, 379 U.S. at 216. In addition, we find disingenuous the company's argument that there is no finding that it restricted union access. It did interfere directly with such access by firing the union activists at the Herkimer store, who were in fact acting as conduits of union information. *See Teamsters Local 115 v. NLRB*, 640 F.2d 392, 400 (D.C.Cir.), *cert. denied*, 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981).

The company cites *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956) for the proposition that the company's property rights preclude union access to its property unless there are no other reasonable means of reaching the employees. But *Babcock & Wilcox* is inapposite because it does not deal with the remedial powers of the Board; it only seeks to determine when an employer's denial of access to his property can itself be deemed an unfair labor practice. *Teamsters Local 115*, 640 F.2d at 400.

■ As to the notice remedies, in addition to the scope of the posting and mailing requirement discussed above, the company objects to the punitive nature of the reading requirement. That requirement was designed "to undo the effect" of numerous and egregious unfair labor practices by assuring employees that the company will respect the rights of workers to form and join unions. See *J.P. Stevens*, 380 F.2d at 305. It insures that the full counteracting force of the remedial order will be felt by the employees. *Id.* On the other hand, we have held that there is an element of some humiliation in the requirement that a company official personally and publicly read the notice. *Id.* at 304. Therefore, we will enforce this aspect of the order only at the Herkimer store, where the violations took place, and require the Board to afford the company the alternative, at its option, of having the notice read by a Board representative, rather than by president Brecker. This alternative eliminates the necessity of participation by the company, if it so desires, and still guarantees effective communication of the Board's order to the company's employees. *Textile Workers of America v. NLRB*, 388 F.2d 896, 904–05 (2d Cir.1967), *cert. denied*, 393 U.S. 836, 89 S.Ct. 112, 21 L.Ed.2d 107 (1968); *J.P. Stevens*, 380 F.2d at 305.

The Board has called to our attention a recent decision of the Court of Appeals for the District of Columbia enforcing, without such an option, the reading requirement the Board seeks here, *United Food and Commercial Workers v. NLRB*, 852 F.2d 1344, 1348–49 (D.C.Cir.1988). However, we have not held that such a remedy "would never be appropriate." Indeed, we have implied just the opposite. *Textile Workers*,

388 F.2d at 904 n. 9; *J.P. Stevens*, 380 F.2d at 305 n. 21. We simply hold that it is not called for by the circumstances here.

## C. *Consolidation of the Complaints by the ALJ*

■ The company argues that consolidation of the two unfair labor practice complaints by the ALJ in July 1980 after she had heard testimony on the first complaint was prejudicial to the company and requires separate retrials of the complaints. The Board found that the consolidation was proper because the two cases involve the same parties and factually related events, and both parties had a full and fair opportunity to litigate the issues. Furthermore, the Board found no evidence that the ALJ prejudged the cases or demonstrated bias against the company. We believe that this was a matter within the Board's discretion, and see no reason to overrule the Board's determination.

■ One last word. The Board issued its order six-and-a-half years after the ALJ's decision. While some of the delay was undoubtedly due to the company's massive attack on the ALJ's decision (the exceptions to it cover 140 typewritten pages), we are troubled by this delay. Nevertheless, we do not think it provides a justification in this case for refusing to enforce an order designed to insure the company's employees the right to participate freely in union activities. See 29 U.S.C. § 158(a)(1). At oral argument, the company relied on our recent decision in *NLRB v. Koenig Iron Works, Inc.*, 856 F.2d 1 (2d Cir.1988), to support its contention that the passage of time was sufficient reason to refuse to enforce the Board's order. However, that case, and others cited by the company, dealt with the propriety of a bargaining order. Such decisions are not controlling here where the Board seeks to remedy the effect of the company's past unfair labor practices by restoring, as much as possible, the status quo that existed at the time the practices occurred. Moreover, since there is no bargaining order here, there need be no concern that employees will be deprived of their free choice by subjecting them to representation they may no longer favor.

The Board's petition for enforcement is granted, with the modification of the order set forth above, and the cross-petition to vacate is denied.