**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HOMER D. BRONSON COMPANY, Respondent.**

No. 07–2447–ag.

United States Court of Appeals, Second Circuit.

April 10, 2008.

Robert J. Englehart, Supervisory Attorney, Ruth E. Burdick, Attorney, National Labor Relations Board, (Ronald Meisburg, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Linda Dreeben, Assistant General Counsel, on the brief) Washington, D.C., for Petitioner.

Edward F. O'Donnell, Jr., Peter A. Janus, Meredith G. Diette, Siegel, O'Connor, O'Donnell & Beck, Hartford, CT, for Respondent.

PRESENT: Hon. JOSEPH M. McLAUGHLIN, Hon. PETER W. HALL, Circuit Judges, Hon. LEONARD B. SAND, District Judge.*

### SUMMARY ORDER

Petitioner National Labor Relations Board ("NLRB" or "Board") filed a petition, pursuant to 29 U.S.C. § 160(e), on June 7, 2007, seeking enforcement of its March 16, 2007 Decision and Order ("the Order") affirming the decision of an administrative law judge ("ALJ"). The ALJ found that Respondent Homer D. Bronson Company ("Bronson" or "the Company") had violated provisions of the National Labor Relations Act ("the Act"), 29 U.S.C. § 151, et seq., in various ways during an organizing campaign conducted at its Winsted, Connecticut facility by the United Automobile, Aerospace & Agricultural Implement Workers of America, Region 9A, AFL–CIO ("Union" or "UAW").

* The Honorable Leonard B. Sand, United States District Judge for the Southern District of New York, sitting by designation.

Bronson filed timely objections to the enforcement of the Order. We assume the parties' familiarity with the underlying facts and procedural history of the case.

This Court's review of the Board's orders is "quite limited." *NLRB v. Katz's Delicatessen,* 80 F.3d 755, 763 (2d Cir. 1996). "We must enforce the Board's order where its legal conclusions are reasonably based, and its factual findings are supported by substantial evidence on the record as a whole." *Id.* In this context, reversal based on a factual question is warranted only if, based on the record as a whole, "no rational trier of fact could reach the conclusion drawn by the Board." *NLRB v. Albany Steel, Inc.,* 17 F.3d 564, 568 (2d Cir.1994). Accordingly, this Court "may not displace the Board's choice between two fairly conflicting views, even though [it] would justifiably have made a different choice had the matter been before [it] *de novo.*" *Newspaper Guild of N.Y., Local No. 3 v. NLRB,* 261 F.3d 291, 301 (2d Cir.2001) (internal quotation marks and citation omitted). Finally, our review of credibility determinations made by the ALJ and accepted by the NLRB is even more limited, as such determinations may not be disturbed "unless incredible or flatly contradicted by undisputed documentary testimony." *Katz's Delicatessen,* 80 F.3d at 763; *see also NLRB v. Am. Geri-Care, Inc.,* 697 F.2d 56, 60 (2d Cir.1982) (noting that credibility determinations may not be overturned unless they are "hopelessly incredible" or "flatly contradict either the law of nature or undisputed documentary testimony") (internal quotation marks and citation omitted).

In this Court, Bronson challenges only four of the 13 violations found by the ALJ and affirmed by the NLRB. The Board is entitled to summary enforcement of the nine unfair labor practice findings not contested by Bronson. *See Torrington Ex-* *tend–A–Care Employee Ass'n v. NLRB,* 17 F.3d 580, 590 (2d Cir.1994). Accordingly, the petition for enforcement of the Order with respect to these uncontested violations is GRANTED.

■ Bronson first argues that the NLRB erred in concluding that the posters and speeches used and given by Charlie Spencer, the president of the automotive group of Bronson's parent company, and Joseph Blancato, Bronson's president of manufacturing, during the organizing campaign violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1). Section 8(a)(1) of the Act makes it an unfair labor practice "for an employer to interfere with, restrain, or coerce employees in the exercise" of their rights under Section 7. 29 U.S.C. § 158(a)(1). Section 8(c) of the Act, however, protects the right of employers to express "any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form ... if such expression contains no threat of reprisal or force or promise of benefit." *Id.*

In *NLRB v. Gissel,* 395 U.S. 575, 618, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court enunciated the parameters of acceptable employer expression in the context of the employer's opposition to unionization:

[A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.' He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to con-

vey a management decision already arrived at to close the plant in case of unionization.

In assessing whether an employer's expression violated the Act, this Court "takes into account 'the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear.'" *Kinney Drugs, Inc. v. NLRB*, 74 F.3d 1419, 1427 (2d Cir.1996) (quoting *Gissel*, 395 U.S. at 617, 89 S.Ct. 1918). In *Gissel*, the Court emphasized the importance of the employer's reliance on objective fact in assessing the propriety of a challenged statement by any employer, noting, "[i]f there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment." *Gissel*, 395 U.S. at 618, 89 S.Ct. 1918.

Bronson primarily relies on the Board's decisions in *Stanadyne Auto. Corp.*, 345 NLRB No. 6, 2005 WL 2342111 (2005), and *Smithfield Foods, Inc.*, 347 NLRB No. 109, 2006 WL 2559835 (2006), two cases in which the NLRB determined that the employers' conduct did not constitute impermissible threats, to argue that its conduct was permitted. The speeches made by Spencer and Blancato, however, differ in several important ways from the speeches determined to be permissible in *Stanadyne Automotive* and *Smithfield Foods*. A review of the record in this case however demonstrates that neither Spencer nor Blancato made it clear that he was not making threats or predicting the future. Rather, in a November 22, 2000, speech during which Spencer described the closing of one Bronson facility after it was unionized, Spencer told the employees that those who don't "read history are bound to repeat it." In his comments during that speech stating the Company had decided to close its unionized Beacon Hill facility because it was "fed up and tired of strikes and disruption" and move the work to Winsted, which had "always been non-union," Spencer explicitly tied the closing of the Beacon Hill facility to its employees' union representation. He implied, moreover, that the Winsted facility's lack of a unionized work force had resulted in it remaining open when other plants had closed. This implied threat of plant closing was only strengthened by his request that the employees not let the Union do to the "new Homer Bronson" what it did to the "old Homer Bronson."

Further, in a December 5, 2000 speech, Spencer stated that, "although strikes are not inevitable, everyone knows that where unions are—strikes occur." From the employee's perspective, this comment reinforced the threatening theme of Bronson's comments to its employees: unions lead to strikes and strikes lead to plant closures. Although the precise content of Blancato's speeches is not ascertainable, a review of the employees' hearing testimony demonstrates that at least some of them took from his speeches the message that other plants had closed because they were unionized facilities. Moreover, when one employee sought clarification from Blancato regarding the meaning of his comment about closures, rather than specifically disavow any implied prediction that the facility would close as the plant manager in *Stanadyne Automotive* had done, Blancato responded that a closure or move "could" happen. Unlike the employees in *Stanadyne Automotive*, therefore, Bronson's employees were not left merely to draw

the inference that unionization leads to plant closures; rather, Spencer and Blancato made that point clear, and suggested that the same could happen at Bronson's Winsted facility. *See Gissel,* 395 U.S. at 618, 89 S.Ct. 1918 ("If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion. . . .").

Further, the poster and overhead projection, while likely permissible on their own, served to emphasize the theme of the Company's impermissible statements to its employees. *See UARCO, Inc.,* 286 NLRB 55, 58 (NLRB 1987) (considering the company's literature and oral statements "as a whole" and noting that "[b]oth the courts and the Board have long held that statements and written materials must be viewed in context and not in isolation"). The record demonstrates that the posters and overhead projections were displayed and referred to by Blancato and Spencer during their speeches to the employees. The contents of these posters and projections focused on the plant closings alleged by Bronson representatives to have been caused by the unionization of those plants' employees, and they served to reinforce the threatening and impermissible message of the speeches given during the meetings with employees. Accordingly, the Board's legal conclusion—that Spencer and Blancato's posters and speeches constituted impermissible threats of plant closure and job loss—is firmly rooted in the record and supported by substantial evidence. The petition for enforcement is GRANTED with respect to this finding.

Bronson next argues that the record does not support the Board's finding that the Company violated Sections 8(a)(1) and 8(a)(3) of the Act when it: (1) prohibited employee Roberta Tyree from working her regular overtime hours; (2) declined to accommodate employee Viterbo "Tony" Pimentel's light-duty work restrictions; and (3) terminated Pimentel after discovering that he was working elsewhere. Section 8(a)(3) makes it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). A violation of Section 8(a)(3) of the Act also constitutes a violation of Section 8(a)(1). *See NLRB v. J. Coty Messenger Serv., Inc.,* 763 F.2d 92, 98 (2d Cir.1985). This Court has noted that "[t]he key issue in [these] cases is the employer's motivation." *NLRB v. S.E. Nichols, Inc.,* 862 F.2d 952, 957 (2d Cir.1988). The Board analyzes unlawful motivation claims using a burden-shifting analysis, under which the General Counsel must first demonstrate that protected conduct was "a motivating factor" in the challenged employment decision. *Id.* Then, the employer bears the burden of demonstrating, as an affirmative defense, that the challenged decision would have occurred "in any event and for valid reasons." *Id.* (internal quotation marks and citation omitted). Finally, the General Counsel can defeat the employer's affirmative defense by demonstrating that the company's stated reasons for the challenged action are "a pretext to mask discrimination." *Id.*

In determining whether an employer's challenged conduct was unlawfully motivated, the Board may consider factors such as the employer's anti-union animus, the disparate treatment of the employee subject to the adverse treatment, the implausibility or unlikelihood of the employer's stated reason, the timing of the challenged conduct, and the employ-

er's deviation from past practice. *See J. Coty Messenger Serv., Inc.,* 763 F.2d at 98; *NLRB v. Porta Sys. Corp.,* 625 F.2d 399, 403–04 (2d Cir.1980); *NLRB v. Long Island Airport Limousine Serv. Corp.,* 468 F.2d 292, 295–96 (2d Cir. 1972). Further, the Board may rely on circumstantial evidence to determine that a company's challenged employment decision was motivated by discriminatory animus. *See Long Island Airport Limousine Serv. Corp.,* 468 F.2d at 295.

■ The Board's finding that Bronson's decision to deny Tyree overtime hours was motivated by her involvement in the Union's activities at the plant is substantially supported by the record. Tyree's testimony that Blancato asked her to not have employees sign authorization cards during company time demonstrates that the Company was aware of Tyree's involvement with the Union. The timing of the denial—shortly after she attended an October 2000 off-site union meeting—and a plant manager's instruction to Tyree's supervisor that Tyree and another employee involved in the organizing campaign were no longer to receive overtime hours support the finding that the decision was improperly motivated. Further, Bronson's conclusory statement that it could no longer allow Tyree to work overtime during the week if she would not work overtime on Saturdays is entirely unsupported by the record, and it is contradicted by Tyree's testimony that she observed other first shift employees working overtime hours on the hinge line when she arrived for the regularly scheduled beginning of her shift. Tyree testified that she had first declined Saturday overtime in April or May 2000 and had been permitted to continue working overtime hours during the week until after she attended the off-site meeting. This testimony was supported by her payroll records, which were introduced as evidence at the hearing conducted by the ALJ. Accordingly, the Board's petition for enforcement is GRANTED with respect to this finding.

■ Likewise, the record and evidence substantially support the Board's finding that Bronson violated the Act when in November 2000 it declined to provide Pimentel with light-duty work to accommodate a back injury. It is not disputed that Blancato was aware that Pimentel was active in the organizing campaign—Blancato spoke with Pimentel about Blancato's opposition to the Union, and Pimentel was among the group of employees who attempted to present Blancato with a letter requesting representation by the Union. The timing of the refusal to accommodate Pimentel's request for light duty—the day after the Union and the Company entered into a stipulated election agreement—suggests that the refusal was motivated by a discriminatory animus. Further, Bronson's reliance on its previous accommodations of Pimentel's light-duty work as evidence that it was not motivated by improper animus in denying him light-duty work in November 2000 is undermined by the plant manager's testimony that it was Bronson's policy to accommodate its employees work restrictions and that restrictions were easily accommodated because there was a variety of easy work available to employees. Although the plant manager testified that he discussed the work limitation with Human Resources Manager Cindy Murphy and Blancato, no other evidence in the record supported that testimony. Moreover, multiple employees testified that they had previously seen Pimentel both stand and sit while performing his assembly work, and Pimentel testified that he had told the plant manager that he could work within the restrictions while performing the job already assigned to him.

Further, to the extent that Bronson argues that the ALJ improperly credited the testimony of Pimentel and other employees over a supervisor's testimony that Pimentel would have been unable to adjust the height of his work table and would have been uncomfortable standing while working, this argument presents no basis to overturn the credibility determination. Bronson's argument relies only on a contrary view of the hearing evidence, without offering any basis upon which this Court might determine that the ALJ's credibility determination is either error or flatly contradicted by undisputed testimony. Although Bronson argues that a previous work restriction required Pimentel to "stay off of his feet," other doctor's notes in the record imposed no such limitation. Accordingly, the Board's petition is GRANTED with respect to this finding.

■ Further, the record and evidence substantially support the Board's finding that Bronson violated the Act when it terminated Pimentel in June 2001. Bronson argues that it reasonably concluded that Pimentel had abandoned his job after Company representatives learned that Pimentel was working at a different factory. However, the record demonstrates that Pimentel sought work elsewhere because Bronson's plant manager had told him not to return to work until he could work without restrictions. Further, when Pimentel came to the Company's facility after receiving the June 2001 letter terminating his benefits, he told Blancato that he had not abandoned his position, and he asked Blancato whether he still had a job with the Company. Blancato told Pimentel that he no longer had a position with Bronson. Blancato's response, despite Pimentel's insistence that he had not abandoned his job, supports the Board's conclusion that Bronson terminated Pimentel on the basis of his union activities. Accord-

ingly, the petition for enforcement is GRANTED with respect to the finding that Bronson violated the Act when it terminated Pimentel in June 2001.

■ Finally, Bronson argues that the NLRB erroneously imposed the unnecessary remedy of requiring Blancato to read the Board's Notice to Employees out loud to employees during mandatory meetings because the Company's conduct had not been egregious enough to merit such a remedy. This Court has noted that, "[i]n recognition of the Board's expertise in interpreting and applying the Act, our review of [the Board's] orders is highly deferential." *NLRB v. Yonkers Assoc.*, 416 F.3d 119, 121 (2d Cir.2005). Thus, an NLRB order is "subject to limited judicial review, and will not be overturned if it may fairly be said to have as its purpose ends that will effectuate the policies of the Act." *Elec. Contractors, Inc. v. NLRB*, 245 F.3d 109, 122 (2d Cir.2001) (internal quotation marks and citations omitted). "[T]he policies of the Act are essentially remedial, and as such, must compensate for the injury actually suffered by the employees." *Katz's Delicatessen, Inc.*, 80 F.3d at 769 (internal quotation marks and citation omitted).

The record in this case demonstrates that the portion of the order directing the public reading of the notice was well within the Board's remedial authority. The unfair labor practice that affected the largest number of employees—the threats of closure and termination—occurred in several mandatory "captive audience" employee meetings conducted by Blancato and Spencer. The mandatory nature of those meetings, at which Bronson officers were free to express their opposition to the Union, contributed to the effect of the violation and enforced the improper threat of job loss and plant closing. Requiring a company official to read the notice to

Bronson's employees will serve to make the Board's corrective measures as pronounced as the improper threats were, and will eliminate any doubt regarding the impropriety of Spencer's and Blancato's behaviors.[1]

For the reasons stated above, the petition of the National Labor Relations Board is **GRANTED.**

---

1. In this regard, the Company has noted in its brief that Blancato is no longer employed by Bronson. Accordingly, while we affirm the nature of the remedy, the NLRB is directed to modify its Order to require a Bronson officer or, perhaps most appropriately, Blancato's replacement, to read the notice to the employees.