SCHWARTZ MANUFACTURING CO., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

and

United Electrical, Radio and Machine Workers of America, Intervening Respondent.

Nos. 88-2594, 88-2733.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 1989.

Decided Feb. 12, 1990.

As Amended Feb. 12, 1990.

R. Clay Bennett, Keck, Mahin & Cate, Chicago, Ill., James R. Scott, Gary A. Mar-

---

sack, Lindner & Marsack, Milwaukee, Wis., for Schwartz Mfg. Co.

Aileen A. Armstrong, N.L.R.B., Appellate Court—Enforcement Litigation, Washington, D.C., George F. Squillacote, N.L.R.B., Milwaukee, Wis., Ronald M. Sharp, Herbert S. Dawidoff, N.L.R.B., Region 18, Minneapolis, Minn., for N.L.R.B.

Robin Alexander, Pittsburgh, Pa., for United Electrical, Radio and Machine Workers of America.

Before POSNER and FLAUM, Circuit Judges, and DUMBAULD, Senior District Judge.*

DUMBAULD, Senior District Judge.

A manufacturer of farm tractor loaders at Sioux Falls, S.D.,[1] chiefly for Ford Motor Company (whose orders constitute 90% of petitioner's business) appeals from a decision of the National Labor Relations Board[2] which held that the company engaged in unfair labor practices violative of Section 8(a) of the National Labor Relations Act of July 5, 1935, as amended, 49 Stat. 449, 452–54, 29 U.S.C. § 158(a)[3] when it in response to unionizing activities laid off 26 employees (almost one-third of its labor force) rather than shutting down the plant for one week (as had been planned two days previously), and by subsequently making the layoffs permanent (in effect terminating or discharging the employees laid off).[4] We affirm, and enforce the NLRB order.

Appellant argues that its action with respect to the two issues urged on this appeal was a justified and legitimate business judgment necessitated by adverse economic conditions and decrease in orders from Ford, appellant's chief customer.

Crucial to appraisal of the validity of this economic defense is a paraphrase of Senator Howard Baker's famous Watergate inquiry: What did President Harold Magowan of Appellant know about the necessity for a layoff and when did he know it? The Board[5] found (and we are not able to say

---

\* The Honorable Edward Dumbauld, United States Senior District Judge of the Western District of Pennsylvania, sitting by designation.

1. Petitioner, Schwartz Manufacturing Co., (sometimes hereinafter called "the company" or "appellant") is a division of Amerequip Corporation, located in Chicago, Illinois. This Court has jurisdiction under 29 U.S.C. § 160(e) and (f). The NLRB has jurisdiction under 29 U.S.C. § 160(a).

2. Hereinafter sometimes referred to as the NLRB or "the Board."

3. That section provides, in pertinent part:
   Sec. 8. It shall be an unfair labor practice for an employer—
   (1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7.
   (2) To dominate or interfere with the formation or administration of any labor organization ...
   (3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ...
   Section 7 provides:
   Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection. [49 Stat. 452]

4. These are the only issues urged by appellant in the case at bar. Various other violations are uncontested. Appellant's brief, p. 13.

   The Board also treated it as an additional violation when the company substituted eight less senior employees for eight more senior employees originally named in the list of layoffs. While technically the new layoffs were a consequence (indeed an intended integral part) of the original unfair labor practice, the company was in fact correcting in good faith a mistake after the matter had come to the attention of Herbert Miller of Amerequip. Viewing it as an independent violation is really nothing but a "fifth wheel" in the proceedings, and it would be a wise simplification if the Board eliminated any reference to this complicating and perhaps confusing feature (as apparently it has done—see App. 117, 142) in formulating the remedial order to be posted where notices to employees are customarily posted.

5. It is the Board's findings (not those of the Administrative Law Judge which the Board reviews) to which we are required to give deference by 29 U.S.C. § 160(e), as worded by § 101 of the Labor Management Relations Act of June 23, 1947, 61 Stat. 136, 148: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." *W.W. Grainger Co. v. NLRB*, 860 F.2d 244, 347 (7th Cir.1988); though of course we recognize, as does the Board, the importance of the ALJ's

that its conclusion is unsupported by substantial evidence) that there was no new information received by Magowan relating to orders from Ford when he made the decision to lay off almost a third of the company's work force; the only new factor was the increasing intensity of union agitation among the employees (App. 111–114).

Elaboration of the circumstances relating to the pattern of dealings between appellant and Ford will emphasize the correctness of the Board's decision.

Appellant's manpower needs vary according to the number of loaders that must be produced to satisfy orders from Ford. Actual shipments are made only when a "release" is issued by Ford. But every month appellant receives a document known to its management as the "Ford report". This specifies, for the current month and for the three succeeding months the products Ford is committed to purchase. For the fifth and sixth months, Ford is committed only for raw materials, though the report contains an estimate of the products expected to be shipped during those months. For the seventh and eighth months a mere anticipated figure is given. Each month's "Ford report" also lists a running total of committed orders beginning with January, and compares that with the actual shipments for the same period. At any given time there might exist "undershipment" (where fewer loaders have been shipped than Ford was obligated to buy) or "overshipment" (where more had been shipped than Ford was obligated to buy). At the end of the year shipments and commitments were balanced by "netting in" (increasing shipments) or "netting out" (decreasing shipments).

In the middle of June, 1985, upon learning that no wage increases would be granted in the near future, employees began to show interest in unionization. The June Ford report, received the third week of June, showed substantial overshipment during the first half year, and also reduced the August commitment from 500 loaders to 350.

On July 18, 1985, Robert Benage, appellant's plant manager, who in May had promised to attempt to give two weeks' notice of any layoffs, announced that there would be a one week shutdown beginning August 5th. (App. 103–104). On both occasions he had made clear that no union would be allowed. On July 19, 1985, appellant learned that Ford would not issue any more July releases, but would permit some early shipments for August.

On July 23, 1985, Magowan received the July Ford report, which he described as "status quo." [6] He confirmed with Ford that Ford would start "netting out" overshipments. On that same day a few day-shift employees wore union buttons for the first time, and Magowan suggested to Miller that a layoff rather than shutdown might be indicated.[7]

On July 24, 1985, the employees "went public" with union buttons and literature throughout the plant. Early on that same morning Magowan decided that a layoff was inevitable.[8]

On July 25, 1985, Benage announced, at a meeting "about the Union", that the planned shutdown would be converted to a layoff. This announcement followed his declaration that the company did not want or need a union.[9]

opportunity to observe the demeanor of witnesses where credibility is questioned. *Kopack v. NLRB*, 668 F.2d 946, 983 (7th Cir.1982).

6. App. 105. In its Brief, p. 17, appellant concedes that: "The Company has never maintained that the July Ford Report contained new information.... The importance of the July Report lies in the lack of change for the better."

7. App. 105, 136.

8. App. 105.

9. App. 106. Benage professed that the change was made because some employees preferred it. However, he paid no attention to an employee vote of 71 to 7 in favor of shutdown. App. 107, 112. The Board properly considered appellant's inconsistent explanations of its action as evidence of its pretextual nature. The Board's conclusion is corroborated by the fact that in the haste to implement the layoff the company's usual practice of respecting seniority was inadvertently disregarded. App. 112; see note 4, *supra.* Some significance may also be attached to the fact that even after business improved the company did not recall any laid-off employees

Then on July 27, 1985, Magowan drafted a letter sent out to the laid-off employees making the lay-off permanent. This was an unprecedented action contrary to the company's past practice.[10]

In view of the foregoing circumstances, it seems clear that the NLRB could appropriately make the findings which it did with respect to the issues involved in the present appeal, and that such findings are supported by substantial evidence of record, and that the Board's order should be enforced.

ENFORCED.

until after a representation election which was held on October 29, 1985. On November 18, 1985, all were recalled simultaneously (though appellant calculated it needed only 18, and some of those recalled were treated as new hires) following a letter of October 31, 1985, to Richard Lytle, one of the co-owners of Amere-

quip, from the Most Reverend Paul Dudley, Roman Catholic Archbishop of Sioux Falls, expressing concern for the unemployed workers. Appellant's brief, pp. 33–34.

10. App. 107–114.