NATIONAL LABOR RELATIONS
BOARD, Petitioner,

and

Wayne Gilbert, Intervenor,

v.

AERONAUTICAL INDUSTRIAL DIS-
TRICT LODGE NO. 91, International
Association of Machinists and Aero-
space Workers, and Local Lodge No.
707, International Association of Ma-
chinists and Aerospace Workers, Re-
spondents.

No. 1216, Docket 90–4123.

United States Court of Appeals,
Second Circuit.

Argued March 22, 1991.

Decided June 4, 1991.

Gregg D. Adler, Hartford, Conn. (Gould, Livingston, Adler & Pulda, of counsel), for respondents.

Edward Gallant, New Haven, Conn. (Keith Bradoc Gallant, Gallant & Gallant, of counsel), for intervenor.

Karen L. Arndt, Atty., N.L.R.B., Washington, D.C. (Jerry M. Hunter, Gen. Counsel, D. Randall Frye, Acting Deputy Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Paul J. Spielberg, Deputy Asst. Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for petitioner.

Before FEINBERG, MESKILL and ALTIMARI, Circuit Judges.

FEINBERG, Circuit Judge:

The National Labor Relations Board (the Board) petitions for enforcement of its order, reported at 298 NLRB No. 47 (1990), against respondents Local Lodge No. 707, International Association of Machinists and Aerospace Workers (Local 707) and Aeronautical Industrial District Lodge No. 91, International Association of Machinists and Aerospace Workers (District 91). The Board found that Local 707 violated section 8(b)(1)(A) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(b)(1)(A), by filing a meritless lawsuit against Wayne A. Gilbert, the charging party before the Board and an intervenor in this action, in retaliation for his protected activities. Local 707 was accordingly ordered to reimburse Gilbert for his legal expenses, and it does not oppose enforcement of this portion of the order. The Board also found that District 91 violated sections 8(a)(1), (3) and (4) of the Act, 29 U.S.C. §§ 158(a)(1), (3), (4), by refusing (as an employer) to recall Gilbert in March 1985 to the position of Labor Representative because he pressed unfair labor practice charges against the unions with the Board and engaged in protected intra-union activities. The Board further found that District 91 and Local 707 violated section 8(b)(1)(A) of the Act by refusing to allow Gilbert to be nominated in February 1986 as a candidate for Labor Representative in retaliation for his protected activities.

To remedy these violations, the Board ordered, among other things, that District 91 reinstate Gilbert as a District 91 Labor Representative for a period at least equal to the time remaining in the term for which he was unlawfully denied recall (about 13

months), thereby restoring his status as an incumbent. Thereafter, District 91 and Local 707 are to permit Gilbert to run as an incumbent candidate for election as a District 91 Labor Representative. Finally, the Board's order requires District 91 and Local 707 to reimburse Gilbert for back pay until such time as he is allowed to run for Labor Representative as an incumbent. Respondents oppose enforcement of these portions of the order, or in the alternative, seek a modification in the remedy. For the reasons given below, we enforce the Board's order in its entirety.

## Background

This proceeding arises out of a bitter and protracted intra-union conflict. The relevant facts underlying the Board's order, however, are not in substantial dispute. District 91 is a delegate body affiliated with the International Association of Machinists and Aerospace Workers (the International). It consists of elected representatives from the five local lodges representing employees at the facilities of Pratt & Whitney in North Haven and East Hartford, Connecticut. Local 707 is one of the locals affiliated with District 91. It represents employees working at the Pratt & Whitney North Haven facility. Pratt & Whitney is a Delaware corporation engaged in the manufacture and non-retail sale and distribution of aircraft engines and related products at North Haven and other locations in Connecticut.

District 91 employs a number of Labor Representatives who assist the locals in such matters as organizing, steward education and leaflet distribution. The Labor Representatives are full-time, salaried employees of the union. The District 91 Directing Labor Representative supervises the Labor Representatives and assigns them to service specific facilities represented by the affiliated locals. These assignments are periodically rotated.

Labor Representatives are employees of District 91, but they are chosen by election for four-year terms by District 91's members. Normally, elections for the position are held in April. In February, each affil-

iated local may nominate or endorse one candidate for each of the open Labor Representative positions. A candidate for the position, in addition to meeting certain mandatory qualification requirements outlined in the International's Constitution, must also receive the endorsement of at least one local. The names of the endorsed candidates appear on a district-wide ballot; the candidates receiving the highest number of votes are elected.

Gilbert was employed at Pratt & Whitney's North Haven facility from January 1973 until the company terminated him in July 1982. During that period, Gilbert held positions in statewide union organizations, served in several Local 707 offices and was its President from 1978 to 1982. Soon after Gilbert's discharge, Local 707 filed a grievance against the company on his behalf.

Later in July 1982, Gilbert, Robert Fleeting and Peter Tinella were each elected as District 91 Labor Representatives for four-year terms beginning in August. On August 1, Gilbert and Fleeting began serving their terms, thereby becoming employees of District 91. Tinella, who needed to work a few more weeks with the company in order to vest his pension, did not report to work as a Labor Representative until August 23.

In April 1983, the International notified District 91 that as of July it would be unable to fund three of District 91's nine Labor Representative positions. The District 91 Bylaws did not have a provision governing such a situation, and there was no precedent for it to rely upon. The Bylaws did prescribe though that any staffing action to be made by the Directing Labor Representative needed the approval of the District 91 Executive Board and Delegate Body. Accordingly, Charles Tracy, the Directing Labor Representative of District 91, obtained such approval to lay off Labor Representatives Gilbert, Fleeting and Tinella on June 30 "on the basis of seniority."

In the last week of May 1983, Pratt & Whitney announced that on June 3 it would lay off a number of employees at its North Haven facility. Had Gilbert been working

at North Haven—his discharge grievance was still pending—the layoff would have affected him.

Thus, as of June 1, 1983, Gilbert expected that he would be laid off by District 91 from his Labor Representative position on June 30 and that he would be unable to return to work at Pratt & Whitney even if he were to win his arbitration by that time due to the impending layoff. On that day, Gilbert found out that the third-shift Safety Representative position was open at North Haven, a position that carried super-seniority and was therefore not subject to the company's layoff plan. The following day, Gilbert and his attorney persuaded the shop steward and another of the District 91 Labor Representatives to ask Local 707 President Walter Nixon to designate Gilbert for the position. Nixon signed a letter of designation that day.

District 91's Bylaws prohibit an individual from holding the positions of Labor Representative and Safety Representative at the same time. On June 2, Gilbert asked District 91 Director Tracy to move up the date of Gilbert's layoff from his position as Labor Representative. Tracy rejected the request and insisted that Gilbert would have to resign as Labor Representative if he wanted the other position. Consequently, the next day Gilbert hand-delivered a letter to Tracy, which stated:

> I am requesting that my layoff as a Labor Representative be effective June 2, 1983 contingent upon the outcome of my current grievance arbitration case and the Company's acceptance of the Union's appointment of myself to Safety Representative.
>
> If it is absolutely necessary I will resign my position as Labor Representative contingent again, upon the conditions above with the same effective date.

Later that day, Pratt & Whitney rejected Gilbert's designation as third-shift Safety Representative because he was not an active employee. On the same day, the company implemented its planned economic layoff at the North Haven facility. On June 30, Gilbert, Tinella and Fleeting were laid off by District 91 from their positions as Labor Representatives.

In early September 1983, Gilbert won the arbitration on his discharge claim against Pratt & Whitney and was awarded reinstatement and back pay. A week later, the company informed Local 707 that because of the June 3 layoff, it could not reinstate Gilbert but would place him on leave-of-absence status. Local 707 thereafter brought suit to enforce the arbitrator's decision, claiming that since it had appointed Gilbert as a Safety Representative prior to the June 3 layoff, Gilbert had a right to be reinstated to active duty.

In December 1983, Gilbert and two other Local 707 members prepared and distributed a leaflet that severely criticized the incumbent administration of the union, charging them with embezzlement, criminal activity and discriminatory treatment of Gilbert and others. Local 707 and the International then filed intra-union charges against Gilbert and his supporters in January 1984, and later tried them on those charges. Gilbert in turn filed unfair labor practice charges against Local 707 and the International, alleging that they had violated section 8(b)(1)(A) of the Act by proceeding against him in retaliation for his activity set forth above, which is protected under the Act.

Gilbert testified before an administrative law judge in August 1984 in support of the unfair labor practice charges. A few days prior to that testimony, Local 707 cancelled Gilbert's membership. Local 707 then declared that Gilbert was ineligible to run for any elective union office, and the International approved this ruling. Gilbert again filed unfair labor practice charges, this time alleging that Local 707, District 91 and the International had violated section 8(b)(1)(A) of the Act by cancelling his union membership in retaliation for his protected activities. In November, Gilbert testified before an administrative law judge in support of these charges.

The following month, Local 707 filed an action in the Connecticut Superior Court, seeking $15,000 in damages and asking that Gilbert be enjoined from entering the

Local 707 union hall, attending union membership meetings and harassing or intimidating union members. The state court denied the injunction request and dismissed the entire suit, finding that even if the complaint's allegations were true, Gilbert's actions did not "even approach the kind of conduct" described in the cases relied upon by Local 707.

Early in 1985, the International notified District 91 that funding would be available for one additional Labor Representative position. At a District 91 Delegate Body meeting in March, it was decided that Tinella would be recalled to fill that position. At that meeting, a delegate asked why Tinella was being recalled instead of Gilbert, who had the greater staff seniority, and he was told that Gilbert was not being considered for the position because he had previously resigned as Labor Representative.

Gilbert immediately sent letters to District 91, asking that he be recalled on the basis of seniority to the position given to Tinella. Tracy replied by a letter in which he insisted that Gilbert had resigned and reminded Gilbert that his union membership had lapsed, presumably due to the unions' cancellation of his membership.

In September 1985, the Board found that Local 707 and the International had violated section 8(b)(1)(A) of the Act by filing and processing internal disciplinary charges against Gilbert and others in retaliation for their protected activities. In January 1986, the Board again upheld Gilbert's unfair labor practice charges, finding that Local 707, District 91 and the International had violated this same section of the Act by cancelling Gilbert's union membership. The January 1986 order provided, among other things, that Gilbert's union membership be. reinstated immediately and that Gilbert be allowed to attend union meetings and run for elective office. However, when Gilbert went to the Local 707 business office to pay his union dues, he was told that the union would not accept his dues because it was going to appeal the Board's decision. Eventually, Gilbert was able to pay his dues after having his attorney work the matter out with the unions.

In February 1986, Gilbert, Local 707 and Pratt & Whitney settled the suit that the union had brought to enforce Gilbert's arbitration award against the company. As part of the settlement, Gilbert agreed to waive any and all rights to reinstatement to his job at Pratt & Whitney.

In that same month, the affiliated locals of District 91 began the process of nominating and endorsing candidates for election for seven Labor Representative positions. Gilbert's name was proposed for nomination at Local 700. However, under the District 91 Bylaws, to qualify as a Labor Representative the nominee had to be employed in one of the shops represented by the District or employed by the District or one of the locals for a year prior to the nomination.

Apparently in reliance upon this provision, one of the incumbent Labor Representatives reported to the members that it was his understanding that Gilbert was not eligible to run for the position under the terms of the District 91 Bylaws because he had resigned. Local 700's President accordingly did not accept Gilbert's nomination. Similarly, when Gilbert's name was put up for nomination at the Local 707 meeting later that month, President Walter Nixon refused to accept the nomination because he determined that Gilbert was disqualified under the District's Bylaws.

In 1987, this court enforced the Board's order reinstating Gilbert's union membership and permitting him to be a candidate for any elective office in Local 707. *NLRB v. Local Lodge No. 707, Int'l Assoc. of Machinists and Aerospace Workers*, 817 F.2d 235 (2d Cir.1987) (per curiam) (*Gilbert I*).

The various unfair labor practice charges that form the basis of this proceeding were filed in 1985 and 1986. In them, Gilbert claimed that the unions violated his rights under the Act by filing the lawsuit against him in Connecticut state court and by refusing to recall him as a Labor Representative in 1985 and to allow him to run for the position in 1986. The charges were consol-

idated, and a hearing before the administrative law judge was held in December 1986. One year later, the administrative law judge issued his decision, finding against the unions on all of the charges and ordering that Gilbert be compensated for his legal expenses in defending the Connecticut suit, reinstated to his former position as Labor Representative, allowed to run for the position after establishing his incumbency and awarded back pay until then. In April 1990, the Board affirmed, with modifications, the rulings, findings and conclusions of the administrative law judge and adopted the recommended order. The Board then issued a supplemental order in October in which it clarified its previous order. This application by the Board to enforce its order followed.

## Discussion

### A. *Local 707's Lawsuit Against Gilbert*

A union violates section 8(b)(1)(A) of the Act if, "in bad faith, [it] files a baseless civil lawsuit against an employee that tends to restrain or retaliate against an employee's [protected activity]." *Sheet Metal Workers' Int'l Assoc., Local No. 355 v. NLRB*, 716 F.2d 1249, 1260 (9th Cir. 1983); see also *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 744, 103 S.Ct. 2161, 2170, 76 L.Ed.2d 277 (1983). The Board found that Local 707 had violated section 8(b)(1)(A) because the action it had brought in Connecticut state court against Gilbert "was meritless and filed for a retaliatory motive." Consequently, Local 707 was ordered to reimburse Gilbert for all legal expenses he incurred in defending against this suit.

The unions do not challenge this finding or the remedy relating to it. "It is against this background that we consider the Board's remaining findings." *NLRB v. Pace Motor Lines, Inc.*, 703 F.2d 28, 29 (2d Cir.1983) (per curiam).

### B. *District 91's Failure to Recall Gilbert in 1985*

■ The unions argue that there is insufficient evidence to support the Board's finding that District 91's decision as an employer not to recall Gilbert to the position of Labor Representative in 1985 violated sections 8(a)(1), (3) and (4) of the Act. We disagree. The Board found that District 91 had a "manifest antagonism toward Gilbert resulting from [his protected] activities." That antagonism is clear from District 91's treatment of Gilbert in retaliation for his protected activities, as adjudicated in *Gilbert I*. See 817 F.2d at 236–37. Indeed, Gilbert testified before the Board on those charges only a few months before District 91 decided to recall Tinella instead of Gilbert. In light of these circumstances, the Board could properly find that unlawful motivation played a part in District 91's decision not to recall Gilbert, since a finding of unlawful motivation may be supported by evidence of the proximity in time of the adverse action to the protected activity. See *NLRB v. S.E. Nichols, Inc.*, 862 F.2d 952, 957 (2d Cir.1988), cert. denied, 490 U.S. 1108, 109 S.Ct. 3162, 104 L.Ed.2d 1025 (1989).

Once it was established that Gilbert's protected activity was a motivating factor in District 91's decision not to recall him, the burden shifted to District 91 to show, as an affirmative defense, that it would have taken the same action in the absence of Gilbert's protected activity. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401–03, 103 S.Ct. 2469, 2474–75, 76 L.Ed.2d 667 (1983). At the District 91 meeting at which the decision to recall Tinella was approved, the reason given for not recalling Gilbert was that he had resigned. Similarly, when Tracy responded to Gilbert's protestations on the matter, he gave this same reason and provided the additional reason that Gilbert's union membership had lapsed.

■ Clearly, it was impermissible for District 91 to refuse to recall Gilbert because his union membership had "lapsed," since in *Gilbert I* we found that the unions unlawfully cancelled Gilbert's membership in retaliation for his protected activities. 817 F.2d at 237. Therefore, the only arguably permissible reason proffered by the union at the time of its decision not to recall Gilbert was that he had previously

resigned from his Labor Representative position. Gilbert's letter of resignation expressly states, however, that he was resigning "contingent upon the outcome of my current grievance arbitration case and the Company's acceptance of the Union's appointment of myself to Safety Representative." It is undisputed that the conditions to Gilbert's resignation were never fulfilled. Thus, until District 91 decided to recall Tinella instead of Gilbert, it treated Gilbert as having been laid off on June 30 rather than having resigned on June 2. The Board found that the record clearly established that neither Tracy nor District 91 actually implemented Gilbert's resignation as effective on the date specified in the resignation letter. For example, after he had received Gilbert's letter of resignation in June 1983, Tracy recommended to the District 91 Executive Board and Delegate Body that Gilbert, Tinella and Fleeting be laid off on June 30. In November 1984, when District 91 was pursuing Gilbert's grievance against Pratt & Whitney for not recalling him as a Safety Representative, District 91 stipulated that Gilbert was "laid off" on or about July 1, 1983. Finally, there was no evidence that District 91 ever notified the International that Gilbert had resigned, even though there was testimony that District 91 routinely notifies the International of an employee's resignation.

There was thus sufficient evidence before the Board showing that District 91's alleged refusal to recall Gilbert because he had resigned was merely a pretext to mask its unlawful motive. The Board could, therefore, properly find that District 91 committed an unfair labor practice by not recalling Gilbert as a Labor Representative in 1985. See *Transportation Management Corp.*, 462 U.S. at 398, 103 S.Ct. at 2472.

The unions claim, however, that they sustained their affirmative defense by showing that District 91 would not have recalled Gilbert because of personal animosity between Gilbert and Tracy that predated Gilbert's protected activity. The Board found that this personal animosity was not sufficient to prevent Gilbert's recall. The unions contend that this finding is contrary to

the evidence and is based on the incorrect assumption that Gilbert had a right to be recalled rather than Tinella. Instead, the unions argue, since District 91 has no provisions for either layoff or recall of its staff employees, it was within the discretion of Directing Labor Representative Tracy to recall Tinella, and so Gilbert could be denied recall despite his protected activities.

It is significant that at the time of the recall decision, District 91 proffered only pretextual reasons for not recalling Gilbert. The unions have not provided any reasons to us why, at the time the decision was made not to recall Gilbert, they did not justify the decision in terms of the personal animosity between Gilbert and Tracy, nor is there any persuasive evidence that the decision was in fact made for that reason. It is therefore reasonable to conclude that District 91's decision not to recall Gilbert was based on retaliation rather than the new set of reasons proffered by the union after the fact. See *S.E. Nichols, Inc.*, 862 F.2d at 958; cf. *Schwartz Mfg. Co. v. NLRB*, 895 F.2d 415, 417 & n. 9 (7th Cir. 1990) (shifting or inconsistent explanations evidence of pretext); *McGraw–Edison Co. v. NLRB*, 419 F.2d 67, 75 (8th Cir.1969) (same). The Board accordingly had sufficient support for its finding that there was "no merit" to the union's claim that Gilbert would not have been recalled in any event because of personal animosity.

■ The unions' contention that it was wholly within Tracy's discretion whether or not to recall Gilbert is relevant for another reason, since the unions claim that a union official may refuse to make a discretionary appointment even though the refusal is retaliation for the applicant's protected activity. See *Finnegan v. Leu*, 456 U.S. 431, 441, 102 S.Ct. 1867, 1873, 72 L.Ed.2d 239 (1982). This rule does not apply, however, when the position is filled by election rather than discretionary appointment. See *Sheet Metal Workers' Int'l Assoc. v. Lynn*, 488 U.S. 347, 355, 109 S.Ct. 639, 645, 102 L.Ed.2d 700 (1989). The Board argues that this exception to *Finnegan* applies here,

since Labor Representatives are elected. The unions dispute this view.

In *Finnegan*, former business agents of a union alleged that they were discharged by the newly elected union president because they had openly supported a different candidate in the presidential election. The agents accordingly claimed that their discharge infringed upon their free speech and voting rights as guaranteed by sections 101(a)(1) and (2) of the Labor–Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. §§ 411(a)(1), (2). The Court found that the discharges did not violate the LMRDA, reasoning that in view of the LMRDA's "overriding objective" of union governance, it "does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own." 456 U.S. at 441, 102 S.Ct. at 1873.

However, the issue before us is not whether District 91's failure to recall Gilbert violated the LMRDA, but whether it violated the Act.

[U]nlike the LMRDA, [the protections of section 8(a) of the Act] are intended to protect the employee-employer relationship. While the LMRDA may be the source for the protection of a union member's right to participate fully and freely in the internal affairs of his own union, the legality of these discharges must be resolved within the framework of the [Act].

*NLRB v. Carpenters Local Union No. 35*, 739 F.2d 479, 483 (9th Cir.1984) (citation omitted), cert. denied, 472 U.S. 1017, 105 S.Ct. 3477, 87 L.Ed.2d 613 (1985); see also *NLRB v. Local 212, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America*, 690 F.2d 82, 85 (6th Cir.1982).

On this view, the unions' reliance on *Finnegan* is misplaced. Moreover, even if the rationale of *Finnegan* is applicable to violations of the Act and putting to one side the question whether Gilbert was appointed or elected within the meaning of *Finnegan*, the evidence showed that the recall decision was not an appointment to be made within Tracy's discretion.

The Board concedes that the District 91 Bylaws did not cover the issue of recalling Labor Representatives who had been laid off by the union. Nonetheless, there was sufficient evidence that District 91 had decided to deal with recalls on the basis of seniority. First, although the Bylaws do not cover layoffs of Labor Representatives, Gilbert, Tinella and Fleeting were laid off in accordance with seniority. It is thus reasonable to infer that recalls would be handled in the same manner. Additionally, at the District 91 meeting at which the decision was made to recall Tinella, a delegate asked why Tinella was being recalled instead of Gilbert, indicating the expectation of District 91 members that recalls would be decided on the basis of seniority. That this delegate was then told that Gilbert had resigned further indicates that Gilbert would otherwise have had a right to the job on the basis of seniority. Indeed, if the decision had been wholly within Tracy's discretionary authority, there presumably would have been no need to resort to pretext for justifying the recall of Tinella.

We accordingly find that there was sufficient evidence to support the Board's conclusion that the recall to the Labor Representative position should have been made on the basis of seniority, and that District 91 denied Gilbert his right to recall in retaliation for his protected activities and in violation of section 8(a) of the Act.

## C. *The 1986 Election*

The unions argue that there is no evidence to support the Board's finding that they violated section 8(b) of the Act by refusing to allow Gilbert to run for office in 1986; they claim that Gilbert simply did not meet the qualifications for candidacy under District 91 Bylaws. The Board concluded that if District 91 had recalled Gilbert as a Labor Representative in 1985, he would have been eligible as an incumbent to run for office in 1986. The unions do not object to this conclusion. Instead, they argue that even if Gilbert's ineligibility was the result of District 91's earlier unlawful activity, the unions' actions in 1986 were not in themselves unlawful but merely rep-

resented the lawful enforcement of the unions' constitution and bylaws.

██ We disagree. When the unions refused to allow Gilbert to run in the 1986 election Gilbert had already settled with Pratt & Whitney, thereby eliminating any possibility that he would be reinstated as an employee of the company. The terms of this settlement were known by District 91 and Local 707 officials, since the unions had represented Gilbert in these proceedings. The unions therefore knew at the time of the nominations that the only way Gilbert could be eligible for candidacy was if he were an incumbent Labor Representative, employed by District 91. But the unions also knew at that point that the only reason why Gilbert had not been recalled by District 91 in 1985—and was consequently ineligible for the election in 1986— was District 91's retaliation against him in 1985. Thus, by blocking Gilbert's nomination in 1986, the unions knowingly used the earlier unlawful retaliation as a means of engaging in further retaliation by denying Gilbert his protected right to run for office.

The conclusion that District 91 blocked Gilbert's nomination with unlawful motive finds ample support in the record. When the question arose about the eligibility of two other candidates for the 1986 election, their situations were referred to the International for a ruling on their eligibility. Gilbert's eligibility was problematic, since he was an incumbent Labor Representative who had been laid off by District 91 and was challenging the legality of District 91's decision not to recall him in 1985. Indeed, the International had apparently never made an eligibility ruling applicable to such circumstances. Nonetheless, the unions did not seek a ruling from the International on Gilbert's eligibility before blocking his nomination. Such disparate treatment is evidence that the unions' asserted reasons for blocking Gilbert's nomination were pretextual. See *Abbey's Transportation Services, Inc. v. NLRB*, 837 F.2d 575, 582 (2d Cir.1988). Moreover, when Nixon blocked Gilbert's nomination at the Local 707 meeting, Gilbert claimed that he was eligible as an incumbent Labor Representative. The

Board found that Nixon then proceeded to deny Gilbert orderly process and "blocked any possibility for the [Local's] own timely rejection of Nixon's [adverse] ruling." Again, such disparate treatment belies the unions' contention that they were innocently enforcing their internal rules.

It would undermine the purposes of the Act if a union could use, with impunity, its earlier retaliatory acts to engage in future retaliation by what would otherwise appear to be lawful conduct. The unions had an arguable basis for finding that Gilbert was ineligible, but that makes no difference if the unions' true motive was retaliation and its illegal prior action based upon that motive was the cause of the ineligibility. See *NLRB v. Local 294, Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 470 F.2d 57, 62 (2d Cir.1972). Since the Board found that to be the case and there was substantial evidence in the record to support the finding, the Board properly concluded that the unions thereby violated section 8(b) of the Act.

D. *The Remedy*

██ The unions raise a number of substantial challenges to the remedy adopted by the Board. Our scope of review in this regard is limited, however, since "Congress has delegated to the Board the power to determine when the policies of the Act would be effectuated by a particular remedy. In fashioning its remedies the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." *Shepard v. NLRB*, 459 U.S. 344, 349, 103 S.Ct. 665, 669, 74 L.Ed.2d 523 (1983) (citation omitted).

██ 1. *Back Pay.* Gilbert was awarded back pay from the time District 91 unlawfully denied him recall as a Labor Representative until the time the unions allow him to lawfully participate in an election as an incumbent candidate for that position. The unions do not dispute that the Board could properly award Gilbert back pay for his remaining time in office had he been recalled in 1985, but argue that their back

pay obligation should terminate at the expiration of that term in 1986 since at that point Gilbert had to be elected for a new four-year term in order to continue as a Labor Representative. The unions claim that absent substantial evidence before the Board showing that Gilbert would have been re-elected in 1986, and again in 1990, the Board's back pay award is unenforceable because it is speculative and punitive.

Of course, there could be no conclusive proof that Gilbert would have been re-elected in 1986 had he been able to run as an incumbent candidate, since a properly conducted election with more than one candidate for a position always has an uncertain outcome. Uncertainty, however, does not render a back pay award speculative, since "[a] back pay award is only an approximation, necessitated by the employer's wrongful conduct." *Bagel Bakers Council of Greater New York v. NLRB*, 555 F.2d 304, 305 (2d Cir.1977) (per curiam). Whether the approximation here is speculative, rendering the back pay award unenforceable, depends on whether there was sufficient relevant factual information before the Board making it reasonable to assume that Gilbert would have been re-elected. Cf. *Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 901–02 n. 11, 104 S.Ct. 2803, 2814 n. 11, 81 L.Ed.2d 732 (1984); *NLRB v. Fugazy Continental Corp.*, 817 F.2d 979, 982–83 (2d Cir.1987).

The unions contend that Gilbert may have lost his bid for re-election because he had waived his right to reinstatement with Pratt & Whitney, thereby undermining the union members' confidence in Gilbert to represent their interests adequately. However, the Board points out that union officials are often able to gain re-election even though years have passed since they ever returned to the employ of the company. The unions also discount the advantages of incumbency on the ground that one incumbent lost his bid for re-election in 1986. This evidence works strongly against the unions, however, since of the eight positions open, only one of the incumbents was defeated.

The record showed that Gilbert had been elected in the previous election in 1982 as well as to other union positions in a number of elections prior to that, including an election for President of Local 707. Gilbert was nominated for a Labor Representative position for the 1986 election at both the Local 700 and Local 707 meetings, was willing to run for the position and would have had the significant advantage of incumbency status in that election. In light of these circumstances, there was sufficient relevant factual information before the Board making it reasonable for it to assume that Gilbert would have been re-elected. The back pay remedy therefore is not speculative, and it is compensatory rather than punitive since Gilbert will not receive more than he would have earned had he been re-elected. To be sure, Gilbert may not have been re-elected, but "the Board can hardly be said to be effectuating policies beyond the purposes of the Act by resolving the doubt against the party who violated the Act." *Leeds & Northrup Co. v. NLRB*, 391 F.2d 874, 880 (3d Cir.1968). Indeed, "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946).

2. *Reinstatement as an Incumbent Candidate.* The Board, in clarifying its original order, characterized this portion of the remedy as follows:

> The remedy requires that Gilbert serve as a labor representative for a period of time at least equal to the time remaining in the term for which he was unlawfully denied recall, in order to restore his status as an incumbent. After Gilbert has been afforded incumbency equivalent to the period from March 11, 1985, to April 30, 1986, District 91 and Local Lodge 707 shall permit Gilbert to run as an incumbent candidate for election to a District 91 labor representative position. [T]his remedy is designed to put Gilbert in the position he would have enjoyed had he not been unlawfully refused recall, without impairing the rights of other duly

elected labor representatives and Union members. Because Respondent District Lodge 91 unlawfully denied Gilbert recall, thereby denying him a period of incumbency upon which to base any future campaign for office, the remedy is aimed at removing this handicap to the extent practicable in this legal context.

█ The unions challenge this remedy on a number of grounds. First, they argue that Gilbert was allowed to participate fully in the 1990 election for District 91 Labor Representatives and lost. Since this was the first scheduled election following the 1986 election, the unions argue that the Board's order no longer serves any remedial purpose. Central to the unions' argument is their contention that it was irrelevant in the 1990 election that Gilbert was not running as an incumbent.

As noted above, seven out of eight incumbents won in 1986, indicating the advantage of incumbency. Similarly, six of eight incumbents won in the 1982 election. Furthermore, it is reasonable to assume that incumbency is advantageous due to the nature of the job, since District 91 Labor Representatives are regularly before members in a variety of situations in which the Representative is able to represent and fight for employee rights. An incumbent has an opportunity to show the members what he can do for them and is able to gain name recognition with the membership. On this record, we believe that the Board could properly assume that significant advantages attach to incumbency. Requiring that Gilbert's incumbency status be restored prior to his running for Labor Representative is therefore appropriate since it both makes Gilbert whole for the loss he suffered and guards against rewarding the unions for their misconduct. See *Fugazy Continental Corp.*, 817 F.2d at 982.

█ The unions make a more compelling argument that the Board does not have authority to order the reinstatement and election remedy because it unduly interferes with the unions' right to conduct their internal affairs as they see fit. They claim that the order intrudes upon the primary jurisdiction of the Secretary of Labor (the Secretary) under Title IV of the LMRDA, 29 U.S.C. §§ 481–483, the statute that specifically regulates the conduct of elections for union officers. See *Local No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen and Packers v. Crowley*, 467 U.S. 526, 539, 104 S.Ct. 2557, 2564, 81 L.Ed.2d 457 (1984). The concerns raised by the unions have force in this context, since

> [r]eliance on the discretion of the Secretary is in harmony with the general congressional policy to allow unions great latitude in resolving their own internal controversies, and, where that fails, to utilize the agencies of Government most familiar with union problems to aid in bringing about a settlement through discussion before resort to the courts.

*Calhoon v. Harvey*, 379 U.S. 134, 140, 85 S.Ct. 292, 296, 13 L.Ed.2d 190 (1964). Although we share the unions' concerns on this issue, we believe that the Board's order in this case does not unduly interfere with the unions' internal affairs or infringe upon the Secretary's primary jurisdiction.

As we found above, even if the unions' retaliation against Gilbert involves internal union affairs, it is nonetheless clear that the Act unambiguously regulates the conduct at issue in this case. The reinstatement component of the Board's order is a remedy for the unions' conduct that violated the Act, indicating that the Board has the authority to grant such a remedy. It is true that Title IV provides the exclusive means of redress "for challenging an election already conducted." 29 U.S.C. § 483. The Board's order, however, does not challenge an election that was already conducted, but merely requires that Gilbert be given an opportunity to run "for the next scheduled election" after he has been properly reinstated. The order thus does not implicate an ongoing election. Cf. *Crowley*, 467 U.S. at 546, 104 S.Ct. at 2568 (exclusivity of Title IV remedies extends to remedies that would substantially delay or invalidate an ongoing election). The order also does not require that the unions hold a special rerun election or call into question a prior election by displacing any previously

elected Labor Representative to make room for Gilbert—remedies that are within the Secretary's jurisdiction. See 29 U.S.C. § 482(c); cf. *Knisley v. Teamsters Local 654*, 844 F.2d 387, 391 (6th Cir.1988) (per curiam) (the Secretary of Labor apparently determined that election of business agent of union not covered by Title IV).

Rather than unlawfully interfering with union elections, the order merely requires that the unions give Gilbert the rights he had under the unions' constitution and by-laws but was deprived of by their unlawful retaliation. The remedy therefore falls squarely within the exception to Title IV exclusivity, which states that "[e]xisting rights and remedies to enforce the constitution and bylaws of a labor organization with respect to elections prior to the conduct thereof shall not be affected by the provisions of this subchapter." Id. § 483; cf. *Calhoon*, 379 U.S. at 139–41, 85 S.Ct. at 295–97 (exclusivity of Title IV applies to challenges to a union's eligibility requirements for candidates for office but not to the union's discriminatory application of those requirements).

We accordingly find that the Board's reinstatement and election remedy does not run afoul of the Secretary's primary jurisdiction to regulate the election of union officers. Indeed, the Board's remedy in this respect is consistent in principle with the order we enforced in *Gilbert I*, which required that Gilbert's union membership be reinstated and that he be "permitt[ed] to be a candidate for any elective office in Local 707." 817 F.2d at 237.

■ 3. *Administrative Delay.* Finally, the unions challenge the order on the ground that due to the length of time between the unlawful acts and the remedy, the underlying situation has so changed "that enforcement of the order now not only would undermine more labor policies tha[n] it would advance, but also would mock reality," citing *Emhart Indus., Hartford Div. v. NLRB*, 907 F.2d 372, 379–80 (2d Cir.1990), and *Olivetti Office U.S.A., Inc. v. NLRB*, 926 F.2d 181 (2d Cir.1991). According to this argument, Gilbert was elected by the union membership to repre-

sent them from 1982 through 1986, but the union membership has changed substantially since then and so requiring Gilbert's reinstatement at this point foists a Labor Representative upon the union membership who is not of their own choosing. Such a result, the unions contend, undermines the union membership's right to choose their own representatives.

We find *Emhart* to be inapposite. In that case, the unfair labor practice consisted of the employer's unilateral change to plant-wide seniority in its procedure for reinstating strikers. 907 F.2d at 375. The union and company subsequently reached two collective-bargaining agreements that permitted the new practice of using plant-wide seniority. Id. at 380. The Board's order was issued thereafter and required that the company cease and desist from reinstating workers on the basis of plant-wide seniority and applied only to a plant that had already closed. Due to these changed circumstances, enforcing the order in that context clearly made little sense. Such changed circumstances, by contrast, are not present in this case. To be sure, the present membership of the unions did not select Gilbert as their Labor Representative, but it is also true that the unions' members in 1985 were deprived of his services for 13 months by District 91's unlawful conduct. Enforcing the order here also serves the salutary purpose of making Gilbert whole, whereas in *Emhart* it was not clear that enforcement would serve any valid purpose. See also *Olivetti*, 926 F.2d at 189–90. Indeed, denying enforcement on the ground of delay alone impermissibly "punishes employees for the Board's nonfeasance." *NLRB v. International Assoc. of Bridge, Structural & Ornamental Ironworkers, Local 480*, 466 U.S. 720, 725, 104 S.Ct. 2081, 2084, 80 L.Ed.2d 715 (1984) (per curiam).

Thus, unlike *Emhart*, it is clear that nonenforcement will undermine the Act. We find guidance for resolving this issue from *NLRB v. Star Color Plate Service*, 843 F.2d 1507, 1508 (2d Cir.), cert. denied, 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 58 (1988), which dealt with the question of

whether a five-year lapse between a certification election and the Board's order certifying the union rendered the order unenforceable because only a few of the employees who voted in the election were still in the bargaining unit. Although we recognized that enforcement "may impose a bargaining representative that is not wanted by a majority of employees and that this result is contrary to the policies of the Act," we nonetheless granted enforcement because failure to do so would also undermine policies of the Act. Id. at 1510; accord *NLRB v. W.A.D. Rentals Ltd.*, 919 F.2d 839, 841–42 (2d Cir.1990).

Since enforcement of the Board's order furthers significant policies under the Act, we do not think that the delay renders the order unenforceable. We have considered all of the unions' remaining arguments and find them to be without merit. We accordingly grant the Board's petition to enforce the order in its entirety.